PHYLLIS C. KINZER, a taxpayer on behalf of and for the benefit of the City of Chicago, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 86—3178

Opinion filed March 22, 1988.—Rehearing denied June 8, 1988.

Robert S. Atkins & Associates, of Chicago (Robert S. Atkins, Robert E. Williams, Terrance A. Norton, and Laura Shimkus, of counsel), for appellant.

Alan R. Borlack, Special Assistant Corporation Counsel, and Gordon & Glickson, P.C., both of Chicago, for appellee City of Chicago.

Ellen G. Robinson, of Chicago, for appellee Daniel Grim.

JUSTICE SCARIANO delivered the opinion of the court:

This taxpayer's action seeks a declaratory judgment against defendants City of Chicago and Festivals, Inc., and alleges that certain city officials acted unlawfully by entering into certain contracts and expending public funds without an appropriation being made therefor by the city council. The plaintiff, Phyllis C. Kinzer, also prays for damages against several of the officials and their sureties for losses the city allegedly sustained thereby. The circuit court entered an order granting summary judgment in favor of defendant Daniel Grim, former city comptroller, and in that same order the court also denied Kinzer's motion for a summary judgment against the City of Chicago and her motion for partial judgment against Grim on the issue of liability. Kinzer filed a timely appeal of that order.

In 1978, the City of Chicago began sponsoring festivals known as "ChicagoFests." The 1978 ChicagoFest was financed by receipts from the hotel operators tax levied by the city and deposited in the hotel operators tax fund. These monies were used for the promotion of tourism, as is required by State law. (Ill. Rev. Stat. 1985, ch. 24, par. 8—3—14.) All expenditures from the fund, designated Fund 355, which the parties agree is a special fund, were made at the discretion of the mayor, as is permitted by the same law, and the city comptroller submitted accountings for such expenditures to the city council.

The comptroller at that time, Clark Burrus, established Fund 666 as separate from Fund 355 in order to account for ChicagoFest receipts and expenditures. Fund 666 initially was financed by "seed money" transferred from Fund 355. When expenses for the 1978 ChicagoFest exceeded income, the resulting deficit was charged against Fund 355. Burrus reported all of these developments to the city council.

In April 1979, certain monies in Fund 355 were transferred into Fund 666 and used to finance the 1979 ChicagoFest, which turned out to be a profitable event. Nevertheless, the profits therefrom were not transferred into Fund 355; instead, all of the receipts from the festival remained in Fund 666. In that year, defendant Comptroller Raymond Coyne, who succeeded Burrus, designated Fund 666 as a "Special Revenue Fund."

In June of 1980 Grim became comptroller, and during his tenure

expenditures for all festivals and other events sponsored by the "Mayor's Office of Special Events" (hereinafter MOSE), including the 1980 ChicagoFest, were charged to Fund 666. Meanwhile, all of the receipts from the hotel operators tax were still going into Fund 355, which was being used to pay for the expenses of the city's other tourist promotion activities. In 1981, Grim executed a contract engaging Festivals, Inc., to manage another ChicagoFest as well as "Loop Alive," "Circus Parade," "Taste of Chicago," and "Autumn Fair," all of which incurred losses that were accounted for in Fund 666, the operating fund for these events. At the end of 1981, Grim's successor, defendant Anthony Fratto, charged the deficit of Fund 666 to the City of Chicago's corporate fund. Fund 666 continued to be used to finance festivals and various MOSE-sponsored events until February 1983, and during this period the deficits increased markedly.

In August of 1982, Kinzer brought this action seeking declaratory and injunctive relief, and a return to the city of funds expended for the festivals by Festivals, Inc., against the City of Chicago, former Mayor Jane M. Byrne, the city's purchasing agent (James Arnold), Festivals, Inc., and its president, Thomas Drilias. In her initial complaint, plaintiff alleged that the city's contracts with Festivals, Inc., and the resultant expenditures were illegal because no funds had been appropriated therefor. In February of 1983, an agreed permanent injunctive order was entered in which the city stipulated that it would refrain from entering into contracts for festivals and from expending further funds for festivals in the absence of prior appropriations being made for them by the Chicago city council.

In August of 1983, Kinzer filed her second amended complaint wherein she named as additional parties Jane Byrne's chief of staff (Thomas Geary), the comptrollers of the city during the Byrne administration (Coyne, Grim, and Fratto), the surety companies that bonded these defendants (Fidelity and Deposit Company of Maryland, and United States Fidelity and Guarantee Company), and several subcontractors for the festivals. Following argument on motions to dismiss and for summary judgment (Ill. Rev. Stat. 1985, ch. 110, pars. 2—615, 2—619, 2—1005) filed by the defendants, the trial judge dismissed the subcontractors, reasoning that they were not liable to repay money they had received for services they had already performed, and granted plaintiff leave to file a third amended complaint. Plaintiff did file a third amended complaint, but did not appeal from the order dismissing the subcontractors.

After Kinzer filed her third amended complaint, defendants filed additional motions to dismiss and for summary judgment which were

based on the contention that plaintiff's action was barred by a judgment in another case involving different parties, but substantially the same issues, under the theory of collateral estoppel. Following the circuit court's denial of these motions, the public officials filed answers and counterclaims and several were granted leave to add third-party defendants. On Grim's motion former Mayor Michael A. Bilandic, Burrus, former corporation counsel Quinlan and Garber, and several attorneys who at that time worked in the corporation counsel's office were made third-party defendants.

In October of 1985, Kinzer filed her fourth amended complaint wherein she requested that the defendant city officials, their sureties, and Festivals, Inc., be ordered to return to the city the MOSE and festival expenses paid out of Fund 666. She also prayed for a declaratory judgment that the subject contracts, *i.e.*, those involving payment for MOSE and festival expenses, were null and void, and for such injunctive relief as the court deemed appropriate. The plaintiff alleged that the city illegally expended $28 million which resulted in losses sustained by the city of approximately $7 million.

Kinzer thereafter filed her motion for summary judgment against the city on count I (declaratory judgment), and for partial summary judgment on the issue of liability against all of the city official defendants and their sureties, except James Arnold, under count II (breach of fiduciary duty). The appendix to her motion included the affidavit of Walter Knorr, comptroller in the administration of the late Mayor Harold Washington, who succeeded Mayor Byrne. Among the material that Knorr is alleged to have relied upon in his affidavit was a memorandum drafted by an assistant corporation counsel who served under Mayor Washington, Robert Janega, which outlined the history of Fund 666. Grim filed a cross-motion for summary judgment. He also moved to strike both the Knorr affidavit and the Janega memorandum on the ground that they did not comply with Supreme Court Rule 191, which provides that affiants must attach to their affidavits the materials upon which they rely. (107 Ill. 2d R. 191.) The court took their motion under advisement, but never formally decided the issue.

Subsequently, and without leave of court, Kinzer supplemented the record with the affidavit of Allen Drebin, professor of public accounting at Northwestern University. Grim moved to strike this affidavit, which was basically an attempt to account for the funds involved in this matter, or alternatively for leave to take Drebin's deposition. At the hearing on Grim's motion the trial judge commented as follows: "Counsel, I'm not going to consider that affidavit nor would any other judge consider that affidavit in ruling on *** [the plaintiff's] motion. If

he did, he would be committing error, reversible error because you would have the chance to take that expert's affidavit." Nevertheless, here again the court did not formally rule on Grim's motion to strike.

On August 1, 1986, the circuit court granted from the bench Grim's cross-motion for summary judgment because it concluded that Fund 666 was a "special revenue fund." Simultaneously the court denied Kinzer's motion for summary judgment against the City of Chicago on her declaratory judgment count and against Grim as to liability. On August 20, 1986, the court issued a written order which memorialized the ruling that it had made from the bench on the first of that month. The detailed order contained many findings of fact and conclusions of law, the most important of which was its conclusion that as a matter of law Fund 666 was a special revenue fund. The court issued a modified order on November 3, 1986, wherein it granted Grim's cross-motion for summary judgment and denied Kinzer's motion for partial summary judgment against both the city and Grim. In its order, the court found that there was "no just reason for delay of enforcement or appeal of the order" and that all matters "relating to the remaining defendants, counts or causes of actions are stayed pending the disposition of the imminent appeal from this order or the further order of this Court." Accordingly, the only parties to this appeal are Kinzer, Grim, and the City of Chicago. The city does not argue before this court that it was not in violation of the law; its sole argument pertains to the standard of care by which Grim's action must be judged. The other parties named in Kinzer's fourth amended complaint are defendants in the action which is still pending in the circuit court.

OPINION

Although Grim's motion to dismiss this appeal based on our supreme court's ruling in *Elg v. Whittington* (1987), 119 Ill. 2d 344, was denied by this court in a prior order, he reasserts the issue in his brief. The *Elg* court held that the time period for appealing pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)) was not tolled by post-trial motions and that any such order must therefore be appealed within 30 days. Since Grim filed his brief, the supreme court has issued a modified opinion in *Elg* which states that its holding should be applied prospectively only. (*Elg v. Whittington* (1987), 119 Ill. 2d 344.) Therefore, this appeal is not barred by *Elg*.

As previously noted, Grim's motions to strike the Knorr affidavit and the Janega memorandum were never ruled upon by the circuit court, thus at this point in the proceedings both documents are considered part of the record. (*People v. Waller* (1977), 67 Ill. 2d 381, 367

N.E.2d 1283, *People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105, 424 N.E.2d 1178.) However, we deem it neither necessary nor helpful to consider either of them in our deliberations over the issues in this case; and since the trial judge made it quite plain that he did not consider the Drebin affidavit in reaching his conclusion, we likewise do not take it into account.

## I

■ The parties are in agreement on the general rule that a municipality may not spend funds without their having been appropriated by its governing body. (Ill. Rev. Stat. 1985, ch. 24, par. 8—1—7; *DeKam v. City of Streator* (1925), 316 Ill. 123, 146 N.E. 550; *Collins v. Village of Glen Ellyn* (1959), 21 Ill. App. 2d 373, 158 N.E.2d 89.) The statute just cited explicitly provides: "No contract shall be made by the corporate authorities *** unless an appropriation has been previously made concerning that contract or expense." (Ill. Rev. Stat. 1985, ch. 24, par. 8—1—7.) Moreover, the litigants also acknowledge that the city council did not appropriate money into Fund 666. There is an exception to the requirement of an appropriation, however, for expenditures made out of special funds. *Branigar v. Village of Riverdale* (1947), 396 Ill. 534, 72 N.E.2d 201; *Simpson v. City of Highwood* (1939), 372 Ill. 212, 23 N.E.2d 62; *Izzo v. City of Loves Park* (1959), 20 Ill. App. 2d 117, 155 N.E.2d 312.

■ Kinzer correctly maintains that Fund 666 is not a special fund because it was not legally created, but is instead one devised solely for the administrative convenience of the comptroller. The city was not required to establish such a fund, nor did the city council authorize its creation. Nonetheless, the comptroller decided to do so for some purpose not disclosed by the record; whatever the purpose, the fact remains that Fund 666 was not a legally created fund. The definitive work on municipal law explains that a fund must be legally mandated:

> "When a municipal corporation, by authority of law, creates a particular fund with reference to which it contracts, any indebtedness arising on such contract is payable therefrom only. Where, however, the so-called fund is created by the city for its own convenience and not by direction of law, it is not payable from such specified fund, but is a general liability, payable out of the general funds of the city, chargeable, perhaps, to a specified account." 15 E. McQuillin, Municipal Corporations §39.45, at 160 (3d ed. 1985).

The first of the "special fund" cases to be decided by our supreme court was *DeKam v. City of Streator* (1925), 316 Ill. 123, 146 N.E.

550, wherein the court refused to allow the City of Streator to pay an engineer who had prepared plans for a sewage system out of the special fund resulting from the sale of improvement bonds. Consequently, the court held that he could be paid only from general, or corporate funds, and according to the statute we have cited above (Ill. Rev. Stat. 1985, ch. 24, par. 8—1—7), only after an appropriation had been made for such disbursement. (*DeKam*, 316 Ill. at 125.) *DeKam* thus requires not only that the creation of a special fund be provided for by law, but also that any expenditure therefrom be legally authorized.

In the seminal case of *Simpson*, the City of Highwood issued water revenue bonds payable solely from the income of the waterworks project which was being financed by the bond issue. (*Simpson*, 372 Ill. at 214.) The plaintiffs argued "that the expenditure of the proceeds of the bonds, and the contracts for such expenditures were unlawful because there was no prior appropriation for the expense of construction, engineering services or purchase of ground," and that only the pumping and purification plant, the water tower, and the water main could be paid for out of the bond proceeds. (*Simpson*, 372 Ill. at 218-19.) Our supreme court held the proceeds of the bonds to be a special fund which could be used to pay all of the above-mentioned expenses of the project, including engineering fees. Although in *Simpson* monies were segregated pursuant to a statute, instead of by referendum as had occurred in previous cases, the court still held that the separation was sufficient to constitute a special fund. *Simpson*, 372 Ill. at 221.

In our supreme court's most recent pronouncement on the issue we confront in this case, the Village of Riverdale had entered into a contract with the plaintiff whereby the latter agreed to extend the village's water system into two subdivisions which the plaintiff was developing, and for which the plaintiff was to be compensated by the village's turning over to plaintiff one quarter of all water bill payments made to the village by the homeowners in those subdivisions. (*Branigar*, 396 Ill. at 537.) Riverdale was sued when it reneged on its contract and defended on the ground that "an appropriation must have been made in this cause before such contract with Branigar Brothers could become valid." (*Branigar*, 396 Ill. at 543.) The court held that since the village could pay the subject expenses only from specific water revenues, it was able to compensate the plaintiff from the statutorily authorized special fund created thereby without a prior appropriation therefor. (*Branigar*, 396 Ill. at 545; see also *Beling v. City of East Moline* (1957), 14 Ill. App. 2d 263, 144 N.E.2d 865.) The court also proceeded to distinguish *DeKam* on the ground that it was the precursor to *Simpson*, and at the time *DeKam* was decided the law did not

permit a municipality to pay an engineer from the proceeds of special revenue bonds; however, the legislature had amended the statute to allow such expenditures by the time the *Simpson* case was decided. *Branigar*, 396 Ill. at 545.

Grim's theory is that this court should conclude that administrative officials may invent a *de facto* fund, in this case Fund 666, and legally recognize it as a special fund. His argument relies primarily on *De-Leuw, Cather & Co. v. City of Joliet* (1945), 327 Ill. App. 453, 464, 64 N.E.2d 779, which he contends stands for the proposition that a special fund need not be statutorily authorized. However, he misinterprets *DeLeuw,* which is analogous to *DeKam, Simpson,* and *Branigar* in that it too involves a waterworks project, and the legislature had authorized municipalities to create special funds for such projects. See Ill. Rev. Stat. 1937, ch. 24, par. 440 *et seq.*

In effect, Grim urges us to overrule, or at least to ignore, the well-established rule that in order to be valid a special fund must be authorized by law. Yet, it is clear that if we were to adopt this approach, we would not only be enabling, we would be encouraging, municipalities to circumvent with great facility the commendable requirement that in order to expend general funds they must first be duly appropriated. If that were to be the case, there would be no end to the number of funds that a city could proliferate for any number of controversial programs in order to avoid the appropriations process. As one court has stated, however, "[t]he ultimate incidence of any debt which consumes an existing public income or resource is on the taxpayer. He cannot be insulated from that impact by the device of a special fund." (*State ex rel. Meyer v. Steen* (1968), 183 Neb. 297, 300, 160 N.W.2d 164, 167.) And as our own supreme court has said:

> "A municipal corporation is bound only when its agents or officers, by whom alone it can act, keep within the limits of the chartered authority of the corporation. Dillon well said (Mun. Corp. 5th ed. sec. 791): 'The history of the workings of municipal bodies has demonstrated the salutary nature of this principle, and that it is the part of true wisdom and of judicial duty to keep the corporate wings clipped down to the lawful standard.' " *Avery v. City of Chicago* (1931), 345 Ill. 640, 649-50, 178 N.E. 351.

Since Fund 666 is not a special one, its contrivance by administrative officials made any moneys therein, perforce, part of the general funds of the city, and any expenditures from the fund were legally required to be made only through the appropriations process. At the risk of being considered to be didactic on the subject, it bears reitera-

tion that since general revenue was spent to pay the subject expenses without an appropriation, the law was undeniably violated whenever such payment was made, including those made during Grim's term of office.

Since the city was not legally obligated to keep Fund 666 separate from the general fund and general revenue was at risk, the city was legally required to appropriate money to pay the subject expenses. Accordingly, this court need not reach the question of whether the fact that the ChicagoFest and MOSE contracts contained provisions specifying the funds they were to be paid from caused the contracts to be expressly void in the absence of an appropriation. Rather, any payments made on the contracts, regardless of the existence of such clauses therein, were unequivocally void given that such expenditures violated the statutory requirement of payment from appropriated funds. The subject contracts obviously cannot override the requirement of an appropriation, as provided for in section 8—1—7 of the Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 8—1—7).

■ Finally, Grim argues that any illegality was a valid exercise of Chicago's home rule power. Our supreme court has stated that an exercise of home rule power is "acts taken by the governing board of a home rule unit, as an assertion of autonomy and independence from State control." (*Sommer v. Village of Glenview* (1980), 79 Ill. 2d 383, 393, 403 N.E.2d 258.) Yet in the case at bar, the city council did not assert its independence; on the contrary, it never acted at all. This omission surely does not satisfy the standard articulated in *Sommer*.

In sum, both the City of Chicago and Grim violated the law. Besides, as we have previously noted, the city presents no defense in its behalf; thus, there are no issues of material fact that need to be resolved as between Kinzer and the city. Therefore, the circuit court should have granted Kinzer's motion for summary judgment against the City of Chicago on count I, the declaratory judgment count.

## II

We must next decide whether Grim can be exonerated from liability even if he violated the law. The initial inquiry is whether Grim is protected by the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1979, ch. 85, par. 1—101 *et seq.*). Kinzer argues that the Tort Immunity Act is inapplicable in taxpayer actions against public officials, a contention with which Grim does not agree. In order to resolve this dispute, we must examine the nature of a taxpayer's action.

■ Our supreme court has stated that taxpayers "possess an equi-

table right to bring suit to protect their interest in public funds." (*Feen v. Ray* (1985), 109 Ill. 2d 339, 344, 487 N.E.2d 619.) The right of a taxpayer to enforce such an interest in public funds is a venerable one. Indeed, it is a right of action which was recognized even during the long reign enjoyed by the doctrine of sovereign immunity. (See, *e.g.*, *People v. Holten* (1919), 287 Ill. 225, 230, 122 N.E. 540; see also Comment, *Taxpayers' Suits: A Survey & Summary*, 69 Yale L.J. 895, 906 (1960).) This equitable right is not limited or confined by section 1—5—1 (Ill. Rev. Stat. 1985, ch. 24, par. 1—5—1), which codified the case law on taxpayers' actions. (*City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 568, 357 N.E.2d 452.) Kinzer's taxpayer's suit seeks to assert a cause of action which has its origins in equity, a branch of our jurisprudence which, needless to say, evolved long before the 1965 passage of the Tort Immunity Act. Since Kinzer is not suing in tort, Grim cannot avail himself of any protection that the Act would otherwise afford him.

■ Taxpayers' actions generally request injunctive remedies. (See Comment, *Taxpayers' Actions: Public Invocation of the Judiciary*, 13 Wake Forest L. Rev. 397 (1976); Comment, *Taxpayers' Suits: A Survey & Summary*, 69 Yale L.J. 895 (1960).) Injunctive relief is not, however, the sole remedy available in a taxpayer's suit; constituents of a taxing body may also resort to such actions to recover, on behalf of the governmental entity, public funds which have been expended unlawfully. *Hays v. Martin* (1926), 240 Ill. App. 340, 345; J. Flaum & J. Carr, *The Equitable Bill of Accounting—A Viable Remedy for Combatting Official Misconduct*, 62 Ill. B.J. 622, 627 (1974); 74 Am. Jur. 2d *Taxpayers' Actions* §48 (1974).

■ The parties to this appeal also strongly disagree as to the applicable standard by which Grim's conduct should be judged. Kinzer maintains that he is strictly liable; he contends that he should be held to a standard of good faith, while the corporation counsel urges us to adopt a due care standard.

When suing to recover public funds, a taxpayer is in essence requesting an accounting; hence, the touchstone to be applied in this type of action is mere illegality. (*Lager v. Rea* (1951), 344 Ill. App. 438, 101 N.E.2d 285; J. Flaum & J. Carr, *The Equitable Bill of Accounting—A Viable Remedy for Combatting Official Misconduct*, 62 Ill. B.J. 622 (1974).) The statute is clear beyond dispute in its sole requirement that the money "have been paid, expended, or released without authority of law." (Ill. Rev. Stat. 1985, ch. 24, par. 1—5—1.) Our courts have never exacted a standard of care either greater or less than the plain statutory requirement; rather, they have focused exclusively on

whether the behavior complained of was illegal. (See *Chicago ex rel. Konstantelos v. Duncan Traffic Equipment Co.* (1983), 95 Ill. 2d 344, 356-57, 447 N.E.2d 789; *Western Lion Limited v. City of Mattoon* (1984), 123 Ill. App. 3d 381, 386, 462 N.E.2d 891; *Hollister v. North* (1977), 50 Ill. App. 3d 56, 58, 365 N.E.2d 258.) Accordingly, Grim must be held strictly liable for his violations of the applicable rule of law.

## III

Grim argues that Kinzer's suit is barred by *res judicata* and collateral estoppel based on the 1983 agreed injunctive order. We find this argument to be without merit.

■ Collateral estoppel and *res judicata* do not obtain in cases wherein a consent decree is entered. It should be recognized that the case cited by Grim, *Keim v. Kalbfleisch* (1978), 57 Ill. App. 3d 621, 373 N.E.2d 565, involved dismissal with prejudice and not a consent decree; thus it is distinguishable from the case at bar. Being a consent decree, the agreed order herein is not the result of litigating the merits and hence not a "judicial determination." (*Massell v. Daley* (1949), 404 Ill. 479, 484, 89 N.E.2d 361; accord *Picardi v. Chicago Truck Drivers* (N.D. Ill. 1983), 581 F. Supp. 794.) On the contrary, the order in this case is to be contrasted with that of a dismissed case; for "a dismissal 'with prejudice' is as conclusive of the rights of the parties as if the suit had been prosecuted to a final adjudication adverse to the plaintiff." *Keim*, 57 Ill. App. 3d at 624.

In addition, Kinzer correctly points out that the instant action is not barred by collateral estoppel or *res judicata* since its does not rely solely on the evidence which was integral to the injunction. For example, information concerning the existence and amount of damages for which Grim may be liable was not relevant in the prior settlement, but is a critical factor in resolving the issues presently before this court. *Picardi*, 581 F. Supp. at 797; *Pillsbury v. Early* (1927), 324 Ill. 562, 565, 155 N.E. 475.

In conclusion, the subject contracts were funded in violation of law. Accordingly, we reverse the circuit court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

HARTMAN, P.J., and STAMOS, J., concur.