HERITAGE COMMONS PARTNERS, Ellen L. Barnes, William F. Cellini, Sheldon H. Ginsburg, and Perry J. Snyderman, Plaintiffs,

v.

VILLAGE OF SUMMIT and Ronald Bragassi, Defendants.

No. 85 C 10713.

United States District Court, N.D. Illinois, E.D.

Feb. 6, 1990.

Michael Cainkar and Vincent Cainkar, Chicago, Ill., for defendants.

Jay Canel and Stephen Davis, Chicago, Ill., for plaintiffs.

## OPINION AND ORDER

POSNER, Circuit Judge (sitting by designation).

This case began as a civil rights suit under 42 U.S.C. § 1983, charging racial discrimination in housing, with pendent counts under state law. The jury brought in a verdict for the defendants on four of the five counts, leaving only a count for breach of contract under Illinois law against defendant Village of Summit—but on that count it found liability and awarded the plaintiffs (a real estate development partnership and the partners) $1 million in damages. I did not enter judgment on the jury's verdict, pending decision on the Village's motion for directed verdict, which I had taken under advisement at the close of the evidence and which is now—the parties having filed post-trial memoranda—ripe for decision as a motion for judgment notwithstanding the verdict.

The who-did-what-to-whom facts bearing on the breach of contract claim are not in dispute. The plaintiffs saw an opportunity to make money developing a disused truck terminal in the Village of Summit, a working-class suburb west of Chicago. They thought they could get HUD grants to build a shopping center (under the "UDAG" program) and to build apartment houses (under the "HODAG" program). A

HODAG grant requires that a percentage of the apartments be reserved for low- and moderate-income tenants. At first the Village board was excited about the prospect of the grants. The partnership requested the board to pass two resolutions and an ordinance: a resolution authorizing the Village President (mayor) to apply for the UDAG and HODAG grants; a resolution establishing a tax incentive financing district to provide financial incentives for the plaintiffs to develop the site, by reducing the real estate taxes that would otherwise be assessed on the development; and an ordinance authorizing the acquisition of the site by eminent domain. At a meeting on July 26, 1984, the board unanimously passed the resolutions and ordinance, and applications were duly prepared by the partnership (at considerable expense), signed by the mayor, and submitted to HUD. HUD had granted the HODAG application, and was considering the UDAG application (which was being processed in another office at HUD and under a different timetable), when public hearings were held by the board, as required by the UDAG program. At these hearings vociferous opposition to the residental component of the project was expressed by citizens who packed the hearing room, and the board unanimously voted *not* to accept the HODAG grant—thus precipitating this suit. (The plaintiffs were not interested in proceeding with the UDAG grant alone, nor is it argued that they were contractually obligated to do so.) The plaintiffs claim that in turning down the grant the Village broke an enforceable promise to proceed with the project if HUD approved the two grants.

■ If the Village were a private firm rather than a municipality, its motion for judgment notwithstanding the verdict would be utterly futile. There was ample evidence from which a reasonable jury could conclude that the plaintiffs and the members of the Village board believed they had a firm contract conditional only on HUD's granting the applications, and that on the strength of this understanding the plaintiffs had expended substantial time, money, and effort preparing the applica-tions and lining up financing for the project. For the board to terminate the contract after HUD *granted* the main application and while it was considering the other application was a clear breach. The fact that a contract is conditional does not make it unenforceable; only if a condition that the promisor insisted on is *not* fulfilled is the promisor entitled to back out of his promise. *Albrecht v. North American Life Assurance Co.*, 27 Ill.App.3d 839, 841, 327 N.E.2d 317, 319 (1975); *Lyntel Products, Inc. v. Alcan Aluminum Corp.*, 107 Ill.App.3d 176, 180, 63 Ill.Dec. 4, 7–8, 437 N.E.2d 653, 656–57 (1982).

■ The wrinkle is that the Village is a municipality, in consequence of which, it argues, its acceptance of the plaintiffs' offer was invalid. Illinois law prescribes certain formalities for municipal contracts, of which two are relevant here. The first—the source of which is unclear but the existence of which is indubitable—is that a municipal contract to be valid must be embodied in a resolution or ordinance of the municipality's governing board; the apparent authority of a municipal official is not enough. *Bank of Pawnee v. Joslin*, 166 Ill.App.3d 927, 940, 118 Ill.Dec. 484, 487, 521 N.E.2d 1177, 1186 (1988); *Tecumseh International Corp. v. City of Springfield*, 70 Ill.App.3d 101, 106, 26 Ill.Dec. 745, 748, 388 N.E.2d 460, 463 (1979). No matter; this condition is satisfied by the two resolutions and one ordinance that Summit's board passed in its July 24 meeting. The fact that these three enactments do not have the form of a contract—do not explicitly promise that the board will accept the HUD grants if they come through—is immaterial. The board would hardly pass a formal resolution to apply for a grant that it did not intend to accept, or to abate taxes on a development it did not intend to approve, or to acquire by eminent domain property intended for use in a development that the board did not intend to go forward with. The only plausible interpretation of the three enactments is that they memorialized and implemented a formal contract to proceed with the project, provided HUD approved the grant applications.

■ What is more, Illinois law authorizes municipalities to delegate expressly the power to bind the city to a contract. *Chicago Food Management, Inc. v. City of Chicago*, 163 Ill.App.3d 638, 643, 114 Ill. Dec. 725, 729, 516 N.E.2d 880, 884 (1987). This was done here. One of the resolutions passed by Summit's board authorized and directed the mayor "to prepare an application for the grant to execute the Development program, as proposed by Heritage Commons Partners, acting as Developer, including all understandings and assurances contained therein." Among the assurances in the application is that the board "stands ready . . . to provide mortgage revenue bond financing for the project" and promises that "upon preliminary funding approval by HUD, the Village will complete acquisition and convey the property to the developers." These were explicit undertakings which bound the Village and which the Village repudiated.

■ The second formality that the Village says was lacking here is an appropriation. Illinois law voids any contract with a municipality that requires an expenditure unless the municipality has appropriated money for the expenditure prior to signing the contract. Ill.Rev.Stat. ch. 24, ¶ 8–1–7(a). The statute is strictly, even harshly, construed, as in *Hogan v. City of Centralia*, 71 Ill.App.3d 1004, 28 Ill.Dec. 428, 390 N.E.2d 595 (1979), where a two-year contract with the city's police chief was held void because the city had not yet adopted its budget for the two years in question when it signed the contract. There is, however, a judge-made exception for cases in which the contract is to be financed out of a special fund, such as a government grant, rather than out of general municipal revenues. *Simpson v. City of Highwood*, 372 Ill. 212, 219–22, 23 N.E.2d 62, 65–67 (1939); *De Leuw, Cather & Co. v. City of Joliet*, 327 Ill.App. 453, 463–64, 64 N.E.2d 779, 784–85 (1946); *Wilson v. Village of Forest View*, 69 Ill.App.2d 400, 217 N.E.2d 398 (1966); *Kinzer v. City of Chicago*, 169 Ill.App.3d 447, 453–55, 120 Ill.Dec. 8, 12–13, 523 N.E.2d 919, 923–24 (1988). The contract in this case was to be financed out of federal grants, the sale of

bonds, and tax-increment financing, not out of general revenues; the contract therefore was within the exception. Of course, as with any municipal contract, performance might involve incidental expenses for police or fire protection and the like; but if these counted, the exception would be eliminated. If the "general fund" is not "at risk," the exception applies. *Id.*, 169 Ill.App.3d at 455, 120 Ill.Dec. at 13, 523 N.E.2d at 924. The general fund was not placed at risk here.

■ Finally, the UDAG regulations required that the Village board agree in its application for the UDAG grant to conduct a public hearing before accepting the grant. The Village argues persuasively that such a requirement implies that the board can change its mind on the basis of the hearing—why else require it? The Village appeals to the principle, strongly affirmed in *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155 (7th Cir.1989), that a preliminary agreement expressly subject to approval by an entity (in that case a board of directors) "whose discretion shall in no way be limited by the [preliminary agreement]" is not enforceable if the approval is not forthcoming. The court distinguished, however, between a preliminary agreement (in that case a letter of intent) subject to approval without standards, and an existing contract, which imposes a duty of good faith on the parties. *Id.* at 159–60. That duty includes the taking of reasonable steps to prevent the occurrence of contingencies that will defeat the contract. *Grill v. Adams*, 123 Ill. App.3d 913, 917, 79 Ill.Dec. 342, 346, 463 N.E.2d 896, 900 (1984); *Jones v. Seiwert*, 164 Ill.App.3d 954, 958, 115 Ill.Dec. 869, 872, 518 N.E.2d 394, 397 (1987); Restatement (Second) of Contracts, § 225, illus. 8; *id.*, § 227(2) and comment d. It is closely related to the duty of a party to a contract that contains a force majeure clause to take reasonable measures to prevent conditions constituting force majeure from arising, and to cure them if they do arise. *Dezsofi v. Jacoby*, 178 Misc. 851, 853, 36 N.Y.S.2d 672, 674 (S.Ct.1942); cf. *Kiyoichi*

*Fujidawa v. Sunrise Soda Water Works Co.*, 158 F.2d 490, 492–93 (9th Cir.1946). A reasonable jury could infer that the members of the Village board made little or no effort to inform the public concerning the pros and cons of the project and that one influential member of the board, who later became the mayor of Summit, actually fanned public opposition, because he thought it would help him to defeat the incumbent mayor in the next election (as he did).

Were there no duty on a municipality to take reasonable steps to prevent the contracts it signs contingent on formal approval following public hearings from collapsing when a shift in the political winds offers councilmen an opportunity to reap personal advantage, it would be difficult for municipalities to make contracts with developers. These plaintiffs would not have been willing to spend hundreds of thousands of dollars to obtain a variety of grants and commitments had they known that they would have no protection if, the grants and commitments being obtained, the Village board balked at the first sign of public opposition—opposition fanned by one of the board's own members.

Against all this it can be argued, first, that if the partners had not wanted to assume the risk of fickle public opinion, they could have negotiated for an undertaking by the board members to make their best efforts to obtain public support for the grants; and second, and more fundamentally, that an agent has no duty to control his principal, especially when the agent is an elected official. The people are sovereign; one who contracts with government subject to ratification by the people cannot force the officials with whom he contracts to influence the people's votes.

However all this may be, there is another and independently decisive distinction between *Apothekernes* and the present case. The source of the requirement of a public hearing in this case is not a statute or ordinance, a bylaw or resolution, or (corresponding to Apothekernes) the contract itself; the source is a term in the UDAG grant application, one of the applications envisaged by the parties' deal. At the hearing, however, no public opposition was expressed to the *UDAG* grant. Everyone wanted a new shopping center, built with federal assistance. Indeed, one source of public concern was that, although the HODAG grant had come through, the UDAG grant was still under consideration by HUD. What the people who thronged the public hearing did not want was low- and moderate-income housing, a condition only of the HODAG grant. Assume that if the public hearings had produced opposition to the UDAG grant, the Village could have refused to go through with that grant; and assume further that the Village could have done this without liability even if the board itself had aroused the opposition. But there was no opposition to the UDAG grant, and hence there is no causal relationship between the requirement of public hearings and the decision by the Village to repudiate its agreement with the plaintiffs. And causation is as much a requirement of contract law of tort law. *Fratelli Pantanella, S.A. v. International Commercial Corp.*, 89 N.Y.S.2d 736, 739–40 (S.Ct.1949); *Model Vending, Inc. v. Stanisci*, 74 N.J.Super. 12, 180 A.2d 393 (1962); *Gulf Oil Corp. v. FERC*, 706 F.2d 444, 453 (3d Cir.1983); *Manganaro Bros., Inc. v. Gevyn Construction Corp.*, 610 F.2d 23, 24–25 (1st Cir.1979); *Wheeling Valley Coal Corp. v. Mead*, 186 F.2d 219, 222–23 (4th Cir.1950).

Put most simply, to rely on an excusing condition (public opposition to the UDAG grant), the condition must occur. Put slightly differently, even if the plaintiffs assumed the risk that the UDAG grant might be disapproved for any reason or no reason following the public hearing, they did not assume the risk that the HODAG grant might be disapproved because of opposition expressed at a public hearing. There was no similar requirement for that grant. On the contrary, in the HODAG grant application the Village was required to and did certify that it had *already* "developed its rental development program after consultation with the public."

If a contract provides that performance will be excused if the promisor's plant

burns down, it does not follow that performance will also be excused if the promisor's plant is closed down by a strike.

The motion for judgment notwithstanding the verdict is denied, and judgment will be entered in accordance with the jury's verdict.

So Ordered.