958 F.2d 374
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
BURDITT, BOWLES & RADZIUS, CHARTERED, Plaintiff-Appellee,
v.
REGIS ASSOCIATES, LTD., Defendant-Appellant.
 No. 91-1199.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 8, 1991.
Decided March 16, 1992.
 
 1
 Before CUMMINGS and RIPPLE, Circuit Judges, and CRABB, Chief District Judge*
 
 ORDER
 
 2
 This is a diversity action brought by Burditt, Bowles & Radzius, Chartered, a Chicago law firm now known as Burditt & Radzius Chartered, against Regis Associates, Ltd., a Delaware corporation with its principal place of business in Washington, D.C. The plaintiff asserted that in 1988 Great Western Resources, Inc., a Texas corporation, controlled the disbursement of funds from Regis. Plaintiff alleged that on May 23, 1989, its attorneys met with vice chairman Mark Harrison of Great Western and John J. Ernest, treasurer of Regis and comptroller of Great Western, in Houston, Texas. According to the plaintiff, Harrison agreed that Regis would pay plaintiff $100,000 for its past legal fees and costs. As maintained in the complaint, plaintiff and members of the New York office of O'Melveny & Myers, a Los Angeles law firm representing defendant, subsequently agreed on the documentation to implement the settlement, and on June 9 defendant's attorneys assured plaintiff that the $100,000 settlement amount would be sent directly to plaintiff, but on June 22 Great Western reneged on the settlement.
 
 
 3
 After a bench trial in December 1990, the district court entered judgment in plaintiff's favor for $100,000 plus pre-judgment and post-judgment interest. We fully agree with the essential attached Findings of Fact and Conclusions of Law of the district judge in supporting the judgment in plaintiff's favor.
 
 
 4
 Only one point needs elaboration. Defendant relies heavily on our opinion in United States v. Orr Construction Co., 560 F.2d 765 (1977), to show that a contract had not been reached at the Houston settlement conference. In the Orr case, the parties never were able to agree upon "proper legal releases" as contemplated by the settlement agreement there. We concluded that the phrase "proper legal releases" made that settlement agreement too indefinite to be enforced, particularly since the parties consistently clashed over the meaning of that phrase during the course of their negotiations following the settlement conference. In contrast, in this case the terms of the releases exchanged by both parties were never questioned, and indeed, as Judge Conlon found, the attorney in charge of this matter at O'Melveny & Myers confirmed to plaintiff on June 12, 1989, that he had received all the executed settlement documents and that plaintiff "would receive the settlement check the following day by overnight air carrier" (Findings 27-29). Consequently, the Orr decision is of no avail to defendant.
 
 
 5
 Judgment affirmed.
 
 ATTACHMENT
 UNITED STATES DISTRICT COURT
 FOR THE NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 
 6
 BURDITT, BOWLES & RADZIUS, CHARTERED, Plaintiff,
 
 
 7
 v.
 
 
 8
 REGIS ASSOCIATES, LTD., Defendant.
 
 89 C 5834
 Dec. 27, 1990
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 9
 This case arises from a dispute over legal fees between a Chicago law firm, Burditt, Bowles and Radzius, Chartered ("Burditt, Bowles") and a former client, Regis Associates, Ltd. ("Regis"). Representatives of the parties met in Houston, Texas on May 23, 1989, to settle the fee dispute and other issues. During the Houston meeting, Burditt, Bowles claims the parties reached a binding, oral settlement agreement. Regis, however, contends that the parties merely negotiated a proposed settlement that was to be effectuated later by drafting and executing certain documents. Regis subsequently refused to go forward with the settlement. Burdett, Bowles then brought this action for breach of the alleged oral settlement agreement.
 
 
 10
 A bench trial was held on December 14, 1990. After hearing the testimony of the witnesses and the arguments of counsel, and after reviewing depositions and exhibits, as well as the parties' trial briefs and proposed findings, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.
 
 FINDINGS OF FACT
 
 11
 1. Burditt, Bowles is an Illinois corporation with its principal place of business in Chicago, Illinois.
 
 
 12
 2. Regis is a Delaware corporation with its principal place of business in Houston, Texas.
 
 
 13
 3. Attorney Donald M. Phares is a partner and a shareholder in the Burditt, Bowles law firm, as well as a Regis shareholder and a member of Regis' board of directors. Prior to joining the Burditt, Bowles firm, Phares was a partner in the law firm of Ruberry, Phares, Abramson & Fox ("Ruberry").
 
 
 14
 4. At all relevant times, Michael R. Steed was president and chief executive officer of Regis.
 
 
 15
 5. On August 16, 1988, Great Western Resources, Inc. ("Great Western"), a Texas corporation, acquired controlling interest in Regis by purchasing approximately 51 or 51% of Regis' stock.
 
 
 16
 6. Before Great Western acquired control over Regis, the Ruberry firm and Burditt, Bowles performed Regis' legal services. Burditt, Bowles claimed that at the time of the takeover, Regis owed Burditt, Bowles approximately $180,000 in legal fees and corporate "start-up" costs. Following the take-over, Great Western vigorously disputed Burditt, Bowles' fee claims.
 
 
 17
 7. During the take-over, Regis was represented by Burditt, Bowles, while Great Western was represented by the New York office of the O'Melveny & Myers law firm.
 
 
 18
 8. After the takeover, a check request system was established, whereby both Steed's approval (on behalf of Regis) and Great Western's approval were required before checks could be disbursed by Regis. Steed dep. 19-20. Great Western refused to approve Steed's $40,989.16 check request dated August 24, 1988, for partial payment of Burditt, Bowles' claimed fees. Id.
 
 
 19
 9. At a Regis shareholders' meeting on October 19, 1988, Regis discharged Burditt, Bowles. Thereafter, O'Melveny & Myers represented both Great Western and Regis.
 
 
 20
 10. Just before the October 1988 shareholders' meeting, Mark Harrison, the vice-chairman of Great Western, and Steed met with Phares and offered to settle the Burditt, Bowles fee dispute; the offer required Phares to relinquish his Regis stock. Steed dep. 57. The offer was rejected. Id.
 
 
 21
 11. Thereafter, Paula Kaplan Berger, another member of the Burditt, Bowles firm, made several demands for payment of Burditt, Bowles' fee claim. On May 9, 1989, Berger wrote a letter to Harrison (of Great Western), offering to settle the fee dispute for $120,000; Berger threatened suit if payment was not made by May 12, 1989. Joint Exhibit 4.
 
 
 22
 12. Harrison agreed to meet with Berger at Great Western's offices in Houston on May 23, 1989 ("the Houston meeting"). Also present was Glenn Z. Hering, who was "of counsel" to Burditt, Bowles; a substantial portion of Burditt, Bowles' billings to Regis were for Hering's services. In addition, John Earnest, Great Western's chief financial officer, attended the Houston meeting.
 
 
 23
 13. The participants' testimony conflicts in a number of material respects. All agree, however, that the principal negotiators were Harrison (on behalf of Great Western and Regis) and Berger (on behalf of Burditt, Bowles). It is also undisputed that the discussion included the following matters: (1) Berger initially stated that she was authorized to settle the fee dispute for $120,000; (2) Harrison put forward the amount of $100,000 as the maximum figure he would consider, but he specified that no settlement could be reached unless Phares would transfer his Regis stock to Great Western and resign from Regis' board of directors; (3) Harrison related Great Western's unhappiness with its investment in Regis because of misleading representations made on behalf of Regis (presumably by Phares and other insiders) during negotiations for the stock purchase; and (4) Berger expressed her eagerness to settle the dispute as quickly as possible, particularly since Hering's status with Burditt, Bowles would be renegotiated in June and failure to collect the Regis fees might adversely affect his position.
 
 
 24
 14. The testimony is sharply disputed concerning Berger's response to Harrison's proposal to settle for $100,000 and the transfer of Phares' stock. Harrison and Earnest claim Berger responded that she did not have authority to agree to anything less than $120,000, nor to bind Phares, and that the meeting ended without any agreement on these points.
 
 
 25
 15. Berger and Hering testified that they excused themselves during the meeting and used a telephone in another office at Great Western in order to discuss Harrison's counter-offer with Phares. Berger and Hering claim they then returned to the meeting and advised Harrison that they were authorized to settle the dispute for $110,000 ($10,000 was to go to Phares' prior law firm, Ruberry, Phares, Abramson & Fox) and that Phares had agreed to Harrison's conditions concerning transfer of his Regis stock to Great Western and his resignation from the board of directors. Berger and Hering contend that Harrison agreed to settle the dispute for $110,000 ($100,000 to Burditt, Bowles and $10,000 to the Ruberry firm) in exchange for Phares' stock transfer and resignation.
 
 
 26
 16. After observing the witnesses,[1] and evaluating their ability to recall events, and the extent to which their testimony is supported or contradicted by other evidence and the subsequent conduct of the parties, the court finds that Berger's and Hering's testimony is more credible and probative. The court finds that Berger and Hering conferred with Phares by telephone during the Houston meeting, they received settlement authority, then conveyed a $110,000 counter-offer that included Harrison's non-negotiable condition concerning Phares and, finally, Harrison agreed to these terms.
 
 
 27
 17. Given the circumstances under which Berger and Hering went to Houston and their eagerness to settle this dispute, as well as Great Western's greater bargaining leverage,[2] the court finds incredible Harrison's and Earnest's testimony that Berger and Hering did not briefly leave the Houston meeting to call Phares and obtain authority to settle the matter and that they concluded the Houston meeting with these proposals still "on the table."
 
 
 28
 18. The existence of a firm and definite agreement is further supported by undisputed testimony that at the conclusion of the Houston meeting, Harrison told Berger to contact Great Western's attorneys at O'Melveny & Myers the next day to work with her in drafting settlement documents.
 
 
 29
 19. Regis shareholders[3] had a "right of first refusal" as to Phares' stock. Therefore, shareholders' written consents had to be obtained before Phares could transfer his stock to Great Western.
 
 
 30
 20. On May 24, 1989, Harrison and Berger each called Mark Rosen of O'Melveny & Myers, the senior partner responsible for Great Western's matters, to coordinate preparation of mutual releases and covenants not to sue to be executed by the principals, and shareholder consents to the transfer of Phares' stock. The attorneys for both parties agreed that Berger was to obtain the necessary signatures from the Burditt, Bowles and Ruberry law firms, Phares and the British investors. O'Melveny & Myers was to obtain the signatures of Great Western, Regis, and the remaining Regis investors.
 
 
 31
 21. On May 24, 1989, Berger also sent Rosen a letter by telefax confirming the settlement agreement and contemplating completion of the necessary paperwork by May 31, 1989. Joint Exhibit 7.
 
 
 32
 22. Rosen responded by letter on May 25, 1989, expressing his displeasure that Berger "... found it necessary to send [a] letter ... which does not reflect the executory understandings regarding the proposed settlement ..." Joint Exhibit 8 (emphasis in original). Rosen specified that essential documents had to be prepared, signed and delivered before the settlement could be effectuated. Id. As an example, Rosen mentioned a waiver and consent prepared by O'Melveny & Myers on Phares' letterhead that had been forwarded to Burditt, Bowles the preceding day: "this document must be signed by all necessary parties and delivered to our firm as one of the conditions of this settlement." Id. Berger further stated that "... we are endeavoring to implement (the necessary components of the proposed settlement)." Id.
 
 
 33
 23. On June 8, 1989, Steed sent O'Melveny & Myers mutual releases and convenants not to sue executed on behalf of Regis, together with the executed consents of all remaining shareholders to the transfer of Phares' Regis stock to Great Western. Plaintiff's Exhibit 11. Steed referred to these enclosures as "... the settlement documents concerning the Don Phares legal bill." Id.
 
 
 34
 24. By June 12, 1989, Burditt, Bowles delivered to O'Melveny & Myers original mutual releases and covenants not to sue executed by the Burditt, Bowles and Ruberry law firms, and by Phares, as well as Phares' Regis stock certificates executed in favor of Great Western, Phares' resignation from Regis' board of directors and the written consent of the English investors to Phares' stock transfer to Great Western. Plaintiff's Exhibits 9, 10, 11; Joint Exhibit 10.
 
 
 35
 25. All essential settlement documents were prepared to the satisfaction of O'Melveny & Myers and Burditt, Bowles.
 
 
 36
 26. On June 12, 1989, Steed sent two Regis check requests to Great Western for approval, one payable to Burditt, Bowles in the amount of $100,000, and the other payable to Ruberry, Phares Abramson & Fox in the amount of $10,000. Plaintiff's Exhibits 15, 16. Steed requested that the checks be sent to the payees by federal express, and he noted on the check requests that the funds were for "settlement" of "legal fees." Id.
 
 
 37
 27. On June 12, 1989, Berger had a telephone conversation with Alden Myers, the attorney at O'Melveny & Myers responsible for drafting and obtaining executed documents for the settlement. The testimony of Berger and Myers conflicts. Berger testified that Myers confirmed that he had received all the executed settlement documents and that Burditt, Bowles would receive the settlement check the following day by overnight air courier. Myers denied these statements at trial.
 
 
 38
 28. The court finds Berger's testimony more reliable and credible, as well as consistent with the documentary evidence. Plaintiff's Exhibits 9, 10, 11, 12, 13, 15, 16; Joint Exhibit 10. Myers' failure to return Berger's telephone calls when the settlement check did not arrive also reflects adversely on his credibility.
 
 
 39
 29. When Burditt, Bowles had not received the settlement check by June 14, 1989, and her telephone calls to Myers were not returned, Berger telefaxed a letter to Harrison at Great Western's Houston office. Plaintiff's Exhibit 13. Berger stated that she had been attempting to reach Alden Myers at O'Melveny & Myers for two days to learn the reason for the delayed transmittal of the settlement check, but Myers had not returned her calls. Id. Berger also related that during her last conversation with Alden Myers on June 12, 1989, Myers confirmed that he had received all the settlement paperwork, and the settlement check would be transmitted by overnight air courier the following day. Id. Harrison did not respond to Berger's telefax.
 
 
 40
 30. On June 22, 1989, Mark Rosen of O'Melveny & Myers had a telephone conversation with Berger. Berger used a conference line at the Burditt, Bowles office; George Burditt and Glenn Hering were present. Rosen informed Berger that Harrison instructed Rosen not to go forward with the settlement,[4] and that there might be litigation because a fraud was committed on Great Western in connection with its investment in Regis.[5]
 
 
 41
 31. On June 26, 1989, Alden Myers returned originally executed settlement documents to Berger. Plaintiff's Exhibit 21.
 
 CONCLUSIONS OF LAW
 
 42
 1. Jurisdiction exists under 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the matter in controversy exceeds $50,000, exclusive of interest and costs.
 
 
 43
 2. Venue is proper under 28 U.S.C. § 1391(a), since Burditt, Bowles resides in this district.
 
 
 44
 3. The parties agree that there are no substantive differences between the laws of Illinois and Texas applicable to this case, and that this court may apply Illinois law.
 
 
 45
 4. In order for an oral settlement agreement between Burditt, Bowles and Regis to be binding and enforceable, the terms of the agreement must be certain and definite, and there must be a meeting of the minds. Rybak v. Provenzale, 181 Ill.App.3d 884, 537 N.E.2d 1321, 1325 (2d Dist.), appeal denied, 127 Ill.2d 641, 545 N.E.2d 130 (1989).
 
 
 46
 5. Burditt, Bowles has established by a preponderance of the credible evidence that at the Houston meeting there was a meeting of the minds between Harrison (on behalf of Regis) and Berger (on behalf of Burditt, Bowles) to settle the underlying dispute over legal fees.
 
 
 47
 6. The terms of the oral settlement agreement were clear and definite: Regis was to pay Burditt, Bowles $100,000 and the Ruberry law firm $10,000. In return, Phares was to transfer his Regis stock to Great Western and he was to resign from Regis' board of directors.
 
 
 48
 7. The settlement agreement was conditioned upon the drafting and execution of (1) shareholder consents necessary for the transfer of Phares' stock to Great Western, (2) releases that would protect all parties from future litigation and claims, and (3) documents transferring Phares' stock to Great Western and effectuating his resignation from the board.
 
 
 49
 8. The fact that a contract is conditional on execution and delivery of documents does not render the contract unenforceable; Regis was not entitled to back out of the settlement agreement unless Burditt, Bowles failed to perform a condition that Regis had insisted on. Heritage Commons Partners v. Village of Summit, 730 F.Supp. 821, 823 (N.D.Ill.1990).
 
 
 50
 9. Burditt, Bowles has established by a preponderance of the credible evidence that the parties did not contemplate reducing their oral agreement to a formal written settlement agreement, but rather intended to draft documents that were necessary to implement their agreement and release all parties from future claims relating to the underlying fee dispute.
 
 
 51
 10. Burditt, Bowles satisfied all conditions required on its part under the oral settlement agreement.
 
 
 52
 11. Regis breached the contract by failing to deliver the settlement funds and its own executed release and covenant not to sue.
 
 
 53
 12. The discretion of Regis (or more accurately, that of its controlling corporate parent, Great Western) to withhold final authorization for release of the settlement funds was subject to the implied obligation of good faith and fair dealing. Greer Properties, Inc. v. LaSalle Nat. Bank, 874 F.2d 457, 460 (7th Cir.1989); Martindell v. Lake Shore Nat'l Bank, 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958). Regis breached its implied duty of good faith and fair dealing by arbitrarily and capriciously refusing to transmit the settlement funds after Burditt, Bowles satisfactorily performed all its obligations under the oral settlement agreement. LaSalle National Bank, 874 F.2d at 460-61.
 
 
 54
 13. Regis has not contested Burditt, Bowles' right to pre-judgment interest at the rate of five percent (5%) from June 12, 1989, and post-judgment interest at the rate of nine percent (9%).
 
 
 55
 14. Accordingly, judgment is entered for plaintiff Burditt, Bowles & Radzius, Chartered, and against defendant Regis Associates, Ltd., in the amount of $100,000, plus pre-judgment interest at the rate of five percent (5%) from June 12, 1989, and post-judgment interest at the rate of nine percent (9%).
 
 
 56
 /s/Suzanne E. Conlon
 
 UNITED STATES DISTRICT COURT JUDGE
 
 
 *
 The Honorable Barbara B. Crabb, Chief Judge of the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 Berger testified by deposition. However, the court has reviewed her needlessly prolonged and contentious deposition
 
 
 [2]
 The terms and conditions of Harrison's counter-offer at the Houston meeting were virtually identical to those he offered Phares approximately six months earlier before the shareholders' meeting. In contrast, Burditt, Bowles substantially altered its position both with respect to the settlement amount and Phares' willingness to relinquish his Regis shares and resign from the board. See Final Pretrial Order, Defendant's Proposed Findings of Fact, p 18
 
 
 [3]
 There were only a limited number of Regis shareholders besides Great Western and Phares: Charles Manatt, Michael Steed, and a group of British investors (referred to as "the Zambisi group")
 
 
 [4]
 The court does not interpret Rosen's expression of regret about the situation as an admission that his client breached the settlement agreement in issue
 
 
 [5]
 Regis filed a counterclaim alleging alternative theories of fraud against Phares and others. The counterclaim was voluntarily dismissed without prejudice on October 18, 1990