(No. 29955.-

ELIZABETH BRANIGAR *et al.,* Appellees, *vs.* THE VILLAGE OF RIVERDALE, Appellant.

*Opinion filed March 19, 1947.*

536

Herbert F. Zornow, of Chicago, (Thomas A. Matthews, of counsel,) for appellant.

Gariepy & Gariepy, of Chicago, (Fred A. Gariepy, and John Spalding, of counsel,) for appellees.

Mr. Justice Fulton delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county finding for the appellees on their bill for an accounting against the village of Riverdale, appellant. The trial judge certified that the validity of a municipal ordinance of the village of Riverdale is involved, and, in accordance with section 75(1) of the Civil Practice Act, the case comes to this court by direct appeal.

The appellees are the trustee and beneficiaries under a trust agreement involving real estate subdivided by the partnership of Branigar Brothers. The appellant, village of Riverdale, is a municipal corporation organized under the Cities and Villages Act of Illinois and was such during the entire period material to this litigation.

In 1925, Branigar Brothers, a firm of real-estate subdividers, became interested in two subdivisions within the village of Riverdale, comprising some 3000 lots which

were offered for sale in certain units numbered 1 to 5. In connection with said development, Branigar Brothers, on April 14, 1925, applied to the village officials for water main extension to one of the subdivisions. The village, not having the money to pay for such an extension of its waterworks system, agreed that Branigar Brothers should finance and construct the extension and the village would reimburse them at the rate of 25 per cent of each and every water bill paid for water consumed in the subdivision and which was to be deducted from those bills upon payment. The president and board of trustees on April 14, 1925, passed an ordinance authorizing the president and clerk to execute a contract with Branigar Brothers for the construction of the water supply extension in this subdivision, the cost to be on a unit price basis as set forth in the ordinance. The ordinance was unanimously adopted and an agreement was then entered into between the village and Branigar Brothers in conformance with the ordinance. A similar ordinance was passed on August 24, 1926, providing for further extensions of the water system into the second subdivision and again a contract was entered into between the parties in conformance with this ordinance. There is no showing in the record that either of these ordinances was ever published or posted but several news items appeared in the issues of the only newspaper in the village reciting the activities of the board of trustees and discussing the ordinances and contracts involved herein.

Bids were received and pursuant thereto a firm of contractors was engaged by Branigar Brothers. The contractors began work under the supervision of the village engineer, who approved the work from time to time. These contractors were paid periodically as units of work were completed, the total expenditures of Branigar Brothers on these extensions totalling $165,831.51.

On November 12, 1930, an ordinance was passed by the president and board setting forth the enactment of the

ordinances of April 14, 1925, and August 24, 1926, reciting that the village had accepted the water main extensions as their property, and acknowledging that the sum of $165,831.51 was due to Branigar Brothers. This ordinance further authorized a contract with Branigar Brothers in conformance with its provisions. Such a contract was entered into and this ordinance was published in full in the only newspaper of general circulation in the village on November 14, 1930. In 1942, Branigar Brothers conveyed their interest in the contracts to the Ivanhoe Realty Trust of which the plaintiff Chicago Title and Trust Company is trustee. By 1933, about 80 per cent of the lots had been sold.

After persons had purchased the lots and had entered into contracts of purchase, the purchasers received bulletins which were supplemental to the sales contracts and which state, in part, as follows: "Whereas, Branigar Brothers Company has agreed by its advertisements and otherwise to make certain improvements in its Ivanhoe Subdivision, it is hereby agreed for the purpose of exactly defining said improvements that the liability of Branigar Brothers is limited to installing improvements as follows and in the manner as may be determined by their engineers in the several and various cases." In the body of said document there appears *inter alia* the following: "Water mains will be installed in the front or rear of all lots."

Sales plats or maps were set up in the sales offices to identify the lots for people who were buying them and these maps were not made a part of the advertising although similar plats without this wording were used in such advertising. On some of these displays there appeared the following legend: "Prices include sewer, water, cement walks and paved streets installed and paid for." On other plats or maps, the same legend appeared except the same items were stated as being "all paid for."

At the time of the hearing, 530 properties in these subdivisions were served with water and the total rates collected from this extension from 1932 up to and including October 1, 1945, was $31,805.21. A total of $206.98 was paid by the village to Branigar Brothers on the contracts up to the last payment which was made on April 30, 1932. In December, 1935, Branigar Brothers requested payment on the contracts in a letter to the village president. In the same month Branigar Brothers were told to get in touch with the village attorney. In February, 1936, one of the plaintiffs wrote the village attorney referring to a conference which had been had with him and asking for further advice. In the same month the village attorney replied that the village felt the price of the extension had been included in the sales price of the lots. Complaint herein was filed in 1942, praying for an accounting of the amounts due Branigar Brothers under the contracts and for a direction to the defendant to pay 25 per cent of all amounts collected for water served within the two subdivisions in question.

The defendant village defends on four separate grounds, (1) that the appellees are barred from the relief they ask by the unclean-hands doctrine, (2) the contracts sued on were *ultra vires* and void in that they were not within the power of the village officials, (3) that the appellees are barred by *laches,* and (4) that the contracts are so unreasonable as to be unenforceable in equity.

The first defense is based on the theory that to allow the appellees to recover would be a fraud on the purchasers of lots in the two subdivisions in that, aside from the contracts with the village to repay Braniger Brothers, Branigar Brothers sold the lots to the purchasers with the representations that certain improvements, among them water, were installed and paid for and that necessarily the price of the lots included all of these improvements all paid for. In

support of this defense, the defendant village refers to the bulletins, which were supplemental agreements to the contract of purchase of said lots, and to the sales plats which were on exhibition in the sales office of Branigar Brothers.

This cause was heard by a master in chancery who heard all the witnesses and determined all questions of fact. It is a well-established rule in this State that where the cause is heard by a master and his findings are approved by a decree of court, such findings will not be disturbed unless they are against the manifest weight of the evidence. *Mruk* v. *Mruk,* 379 Ill. 394.

The record does not disclose that any of the advertisements used by Branigar Brothers in the sales of these lots were admitted in evidence. The appellant made an offer of proof in the examination of G. O. Reasor, one of the appellees, to show by Mr. Reasor that the sales price of these lots included the improvements in question. This offer was overruled. None of these purchasers of lots in the two subdivisions appeared at the hearing to testify. Reasor was the only person testifying as to this transaction and he testified as to the agreement with the village and that the plats used in the sales office were not used in advertising. The master found that the owners of lots in the subdivision were not paying higher rates than elsewhere in the village and that the method of reimbursement would work no hardship on them. The appellant claims that if the relief prayed for is granted it will be necessary to increase the rates in the subdivision, but it is to be noted that there is no testimony in the record to support this statement.

The question under this particular defense, then, is whether the statements in the supplemental contract and the statements on the sales charts are to be construed to mean either (a) that Branigar Brothers were obligated to install the water without obtaining any return therefor, or

(b) that the prices of the lots were increased by the unit price of the mains and that to allow Branigar Brothers to recover from the appellant would allow them to recover twice for the same installation. This is a question of fact.

A careful reading of the documents involved does not disclose that the construction given them by the master is against the manifest weight of the evidence or against the apparent meaning of the documents themselves. The bulletins, which were supplemental to the contracts of purchase of the lots, set forth the installation of sanitary sewers, water mains and gas mains. The agreements further set forth that Branigar Brothers will, "at their expense" grade and pave certain streets. There is no reference to the installation of the sewer, water and gas mains as being done at Branigar Brothers' expense. As logical a construction of the language in these bulletins as that sought by appellant is that the lots will have all the improvements mentioned paid for by someone. In the case of the water mains, they were paid for by Braniger Brothers who had an agreement to turn over the extension to the village in return for the village agreeing to pay for the system out of the proceeds. The same is true of the sales plats found in the sales offices of Branigar Brothers. We cannot say, under the wording of the documents in question, that there was any error in the master's findings.

It is true, as contended by appellant, that equity will not use its powers to effectuate a fraud, (*Glos* v. *Stuckart,* 277 Ill. 346,) but there must be some evidence to justify the application of the unclean-hands doctrine by a court of equity. Here, the only evidence is that of the written documents, and, where there are several logical constructions of the wording of such documents, we are not justified in accepting one as against the other in the absence of any other proof concerning the persons whom the appellant claims have been defrauded. The cases cited by appellant

under this point of defense do not apply unless a fraud has been established and we cannot say that one has been proved in this cause.

On the question of *ultra vires,* the appellant relies on the following points: (1) that the contracts were *ultra vires* in that they were not authorized by statute, (2) that the ordinances of 1925 and 1926 were not published and therefore were void, (3) that no prior appropriation having been made for the expense of a system, the contracts were a nullity.

Municipal officials have only limited delegated powers and municipalities have only those powers which are given them by statute and charter. (*Agnew* v. *Brall,* 124 Ill. 312; *Law* v. *People ex rel. Huck,* 87 Ill. 385; *Avery* v. *City of Chicago,* 345 Ill. 640; *City of Chicago* v. *Ingersoll Steel Division of Borg Warner Corp.* 371 Ill. 183.) The appellant further argues that the mere acceptance of benefits under a contract not authorized by statute does not justify recovery, and cites the cases of *DeKam* v. *City of Streator,* 316 Ill. 123; *Gathemann* v. *City of Chicago,* 263 Ill. 292; *May* v. *City of Chicago,* 222 Ill. 595; *Goldstine* v. *Chicago,* 306 Ill. App. 556; *Hope* v. *City of Alton,* 214 Ill. 102.

The appellees contend, however, that there are two types of *ultra vires* contracts, those where there is no power to contract, whatsoever, and those situations where a contract is *ultra vires* in a secondary sense, in that there is a power of the municipality to enter into a contract but the contract is irregularly made. In this latter type of case, the appellees argue that when the city or village accepts the benefits of the contract, it is estopped from setting up or relying on its own irregularity to defeat recovery, citing *McGovern* v. *City of Chicago,* 281 Ill. 264; *Hall* v. *County of Cook,* 359 Ill. 528.

An examination of the cases cited by appellant and enumerated above, discloses that the contracts involved therein

were expressly prohibited by a valid statute and were, therefore, void. In *McGovern* v. *City of Chicago,* 281 Ill. 264, this court distinguished between *ultra vires* contracts and contracts within the power of the city which have been irregularly or illegally made but have been performed in good faith. We there held that a municipality cannot set up such irregularities as a basis for refusing to pay, and cited with approval the cases of *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railroad Co.* 244 Ill. 220, and *People ex rel. Stead* v. *Spring Lake Drainage and Levee Dist.* 253 Ill. 479. The sole question, then, under this defense is whether, under the statutes in effect at the time this contract was made, the municipality had power to enter into these contracts. The appellant contends that such power was lacking in that there was no publication of the 1925 and 1926 ordinances and that there was no appropriation for the payment of such system.

The appellees rely on the act of 1899, (Ill. Rev. Stat. 1937, chap. 24, par. 440 *et seq.*) which authorizes the building or purchase of a waterworks system or a water supply system, or an extension or enlarging of an existing system with the further provision that payment therefor might be made by issuing certificates of indebtedness limited in payment solely from the water fund which is described as the entire proceeds arising from the operation of the system, and that such indebtedness shall not in any event constitute an indebtedness of such municipality within the meaning of the constitutional limitation. The appellant relies on other statutory provisions which prescribe that no contract shall be made by a board of trustees and no expense shall be incurred by any officers of a municipal corporation unless an appropriation shall have been previously made concerning such an expense. Whether an appropriation must have been made in this cause before such contract with Branigar Brothers could become valid depends on the cases decided in like situations.

A study of the cases in point discloses that distinction is made in those situations in which the contract results in a debt against the municipality proper and those cases in which the payment of the contract price is limited to a special fund. In *Schnell* v. *City of Rock Island*, 232 Ill. 89, taxpayers sued to enjoin the city from paying certain bonds issued to pay for a waterworks. The ordinance providing for the bond issue pledged the faith, property and revenues of the city to pay the same and set forth an annual tax for that purpose. Certificates of indebtedness, which were also involved, were to be payable both from the water fund and from special taxes. We held that, under these facts, a debt was established when the entire proceeds of the existing system as well as the extension were pledged in payment of the debt. We said, however, "A city may acquire a system of water-works by pledging the income until it shall pay for the system, and no indebtedness is created." It was further stated that the same rule might apply to some definite extension of a waterworks where the income of the extension could be separated and applied to payment but that an obligation to pay with income from property already owned by the city is not different from an obligation to pay with any other funds. In *People ex rel. Chadwick* v. *Sergel*, 269 Ill. 619, we held that a city was not justified in taking miscellaneous revenues, not derived from taxes, and appropriating them after the expiration of the first quarter of the year to the payment of current liabilities. It should be noted in this case that the appropriation was set up to pay for services not set out in the regular appropriation. In *DeKam* v. *City of Streator*, 316 Ill. 123, we held, on a bill to enjoin a city from paying an engineer for work in preparing plans for a sewage system, for which payment no appropriation had been made, that the contract was void as in violation of section 4 of article 7 of the Cities and

Villages Act. (Ill. Rev. Stat. 1937, chap. 24, par. 104.) In *Simpson* v. *City of Highwood*, 372 Ill. 212, this court said that the section of the statute argued by appellant is mandatory as to contracts payable from the general funds of the municipality· and that it applies not only to funds raised by taxation but to miscellaneous receipts which are a part of the general funds. However, in that case we further stated that the *DeKam case* was not controlling there because we had never held that the contracts for or the expenses of constructing the portion of a local improvement which is not to be paid from general funds of a municipality must be preceded by an appropriation. The *Simpson case* involved an extension to an existing waterworks system and we stated that the contracts and expenditures in the case were, in many respects, analogous to those under a local improvement proceeding, and that while, in local improvements, the contractors take the bonds, and in the *Simpson case* they were to be paid from the proceeds of the bonds, we could observe no material difference in the result. The bonds in either case were not an obligation of the municipality and the holder could look only to the special fund for payment which must be segregated and could never become a part of the general corporate funds.

The distinction in the above cases depends on whether the special fund is a part of the general fund or a segregation of income which never becomes a part of the general fund. It would seem clear, on the authorities cited, that in the instant case no debt was created on the part of the defendant village. The appellees can never look to the taxes or the general fund of the village for payment. They can only look to 25 per cent of the water revenues collected from the particular extensions in question, and on this basis the case falls within the rule of *Simpson* v. *City of Highwood*, 372 Ill. 212, and can be distinguished from

the cases of *Schnell* v. *City of Rock Island,* 232 Ill. 89, and *City of Joliet* v. *Alexander,* 194 Ill. 457, where existing properties and income of the city were pledged to the payment of the amounts due.

Having held that no appropriation was necessary to validate the contracts here, we find that there is a power on the part of the defendant village to enter into the contracts in question unless the failure to publish voids such power. We have already stated that where there is a power to enter into a contract but such contracts are irregularly made, and the city accepts the benefits of the contracts, it is estopped from setting up or relying on its own irregularity to defeat recovery. (*McGovern* v. *City of Chicago,* 281 Ill. 264.) In the *McGovern case,* the municipality failed to publish as required by statute and we said, (citing Dillon on Municipal Corporations, 5th ed. sec. 1611,) that a municipal corporation, as against persons who have acted in good faith and parted with value for its benefit, cannot, unless by virtue of some statutory provision, set up mere irregularities in the exercise of power conferred, as, for example, its failure to make publication. In *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* 244 Ill. 220, in a similar situation, we held that to permit a city now to say that it neglected publication of an ordinance would be a fraud which the law ought not to permit.

Under these holdings we cannot say that the failure of the village to publish is any more than an irregularity in the exercise of its power. The actions of the board of trustees were given publicity in the newspaper circulated in the village and there is no question but what people knew of the proposed action. It is to be further noted that the ordinance of 1930, which acknowledged the debt and accepted the extension of the waterworks system, was published as required by statute. The residents of the

defendant village had full legal notice at this time of the ratification of the prior ordinances and could have objected to the entire transaction at that time. We, therefore, hold that under the act of 1899, there was a power in the village to enter into the contracts here in question and that the failure to publish was an irregularity, only, which the city is now estopped from asserting in defense of this cause.

The appellant further claims that the appellees are barred by *laches*, in that the ordinances were passed in 1925, 1926 and 1930, and the last payment was made on April 30, 1932, while the suit was started nine years and eleven months after the last payment. It should be noted that the record discloses letters and references to conferences with regard to the payment of these sums and attempts to settle the controversy amicably. We cannot say that under the facts the plaintiffs were dilatory in commencing their action. Negotiations were under way as late as 1936, and the appellant was on notice at that time that appellees had not foregone their rights and were attempting to collect what was due them. There is nothing in the record to support appellant's claim that had they known they were to pay the sums due under the contract they would have increased the water rates.

The village defends on the further ground that the contracts were so unreasonable as to be unenforceable in equity, basing the contention on the fact that, at the time the contracts were made, a debt of $165,831.51 was settled on a village having a population of less than 1800 people. They further support this contention by saying that the amount due, under the contract provisions, comes to only $1750 a year at the present time, at which rate it would take over ninety years to pay off the debt. To substantiate this defense, the village cites section 12 of article IX of our constitution which provides that no municipal corporation shall be allowed to become indebted, including existing

indebtedness, to an amount exceeding five per cent of the value of the taxable property therein. This contention is not sound. As we have seen, the village has incurred no debt as such. (*Simpson* v. *City of Highwood,* 372 Ill. 212.) The amount of the payment under the contracts is dependent upon the number of users and the amounts collected from the sale of water to said users. It was contemplated, obviously, between the parties at the time the contracts were entered into that the village would become larger and that, as the village grew larger, the payments for the extension would increase. Both parties were interested in the sale of lots in these subdivisions and the village benefited by an increased number of homes. That, perhaps, the village did not increase as rapidly as the parties contemplated is not a point which is involved here. The important factor in this defense is that the appellees may look only to a portion of the water revenues collected as set forth in the contract and the appellant can only pay them that portion. We cannot say, under the facts in this case, that the mere fact that the total payment for this extension may encompass a period of ninety years, or more, is sufficient in itself to make these contracts unreasonable and, therefore, unenforceable.

The point raised by the appellant that appellees have a remedy at law is answered by the fact that this is a bill' for accounting where the items are voluminous and complex. With respect to the 25 per cent of the water revenues already collected and which remain unpaid the village occupies a position analogous to that of a trustee holding the funds for distribution. In *Rothschild* v. *Village of Calumet Park,* 350 Ill. 330, we held that an entire absence of a remedy at law is not necessary to sustain a suit in equity but that the inadequacy and impracticability of the remedy is equally effective to give equity jurisdiction of the cause. In that same case we said that, where a village collected

parts of installments against which bonds were issued, the money so collected constituted a trust fund and the village became a trustee of that money. Under this line of reasoning, equity has jurisdiction of the proceedings.

For the reasons stated herein, the decree of the circuit court is affirmed.

*Decree affirmed.*