# Illinois Official Reports

## Supreme Court

---

**Restore Construction Co. v. Board of Education of Proviso Township
High Schools District 209, 2020 IL 125133**

---

| | |
|---|---|
| Caption in Supreme Court: | RESTORE CONSTRUCTION COMPANY, INC., *et al.*, Appellees, v. THE BOARD OF EDUCATION OF PROVISO TOWNSHIP HIGH SCHOOLS DISTRICT 209, Appellant. |
| Docket No. | 125133 |
| Filed | April 16, 2020 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. Circuit court judgment reversed. Cause remanded. |
| Counsel on Appeal | William F. Gleason, Eric S. Grodsky, Raymond A. Hauser, and John M. Izzo, of Hauser, Izzo, Petrarca, Gleason & Stillman LLC, of Flossmoor, for appellant. |
| | Michael W. Rathsack, of Chicago, and Gene A. Eich, of Morton Grove, for appellees. |

Justices       JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Theis, and Neville concurred in the judgment and opinion.

Justice Garman dissented, with opinion.

Justice Michael J. Burke took no part in the decision.

## OPINION

¶ 1  At issue in this case is whether the circuit court of Cook County erred when it concluded that Restore Construction Company, Inc., and Restore Restoration, Inc. (referred to collectively as Restore), are barred from recovering the remaining sums they seek for emergency repair and reconstruction work they performed on behalf of the Board of Education of Proviso Township High Schools District 209 (the Board and District, respectively) solely because certain steps normally required by the School Code (105 ILCS 5/1-1 *et seq.* (West 2014)) for approval of contracts may not have been followed. Although the Board was operating under the control of a Financial Oversight Panel (FOP) (see *id.* § 1H-1), the FOP's chief fiscal officer approved the contracts once they were signed by District officials, the work was undertaken on an emergency basis and informally approved by a majority of the Board following its completion, there was no dispute as to the need for the work or the reasonableness of the charges, and Restore received timely payment from the Board's insurance company for most of the work it performed, the circuit court believed that under the law the Board should have let the project out for competitive bidding and then approved the contracts by a formal vote before the work commenced. In the view of the circuit court, its failure to do so precluded any further payments to Restore. It therefore dismissed all counts of Restore's third amended complaint with prejudice, leaving the parties in the position it found them when the litigation began.

¶ 2  On appeal, Restore challenged only the circuit court's disposition of counts I and II of its third amended complaint. Those counts, which sought recovery based on *quantum meruit*, were dismissed by the trial court pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018). The appellate court reversed and remanded. It held that Restore is entitled to proceed against the Board based on *quantum meruit* and that the *quantum meruit* counts asserted by Restore in counts I and II of its third amended complaint remain viable. 2019 IL App (1st) 181580. We granted the Board leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)). For the reasons that follow, we affirm the appellate court's judgment.

¶ 3               BACKGROUND

¶ 4  Because this matter comes before us in the context of a dismissal under section 2-619 of the Code of Civil Procedure, we accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that may reasonably be drawn in the plaintiff's favor. *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 96-97 (2004). Pursuant to this standard and based on the allegations

in Restore's complaint, we take the facts of this case to be as follows for the purposes of our review.

¶ 5 On May 10, 2014, a serious fire broke out at Proviso East High School (Proviso East) in Maywood, one of three public high schools operated by Proviso Township High Schools District 209. The blaze caused significant damage to the structure and its contents, jeopardizing the ability of the District to safely reopen it in time for the planned beginning of the next school year the following August, just three months away.

¶ 6 At the time of the fire the District was governed by a seven-member elected board of education led by Daniel J. Adams, the Board's president. Among Adams's responsibilities were presiding over the business of the Board at official meetings and signing official District documents. Netti Collins-Hart, Ed.D, was employed by the Board as superintendent of schools. In that capacity, she served as the District's chief executive officer and was responsible for the administration and management of the District's schools in accordance with the Board's policies and state and federal law.

¶ 7 The District was also subject to an additional level of supervision and control. In 2008, the State Board of Education established an FOP to oversee the District pursuant to the School District Financial Oversight Panel and Emergency Financial Assistance Law (105 ILCS 5/1B-1 *et seq.* (West 2008)). The District subsequently became subject to the Financial Oversight Panel Law (105 ILCS 5/1H-1 *et seq.* (West 2012)), which took effect in 2011, and it operated under an FOP established in accordance with that statute (see *id.* § 1H-15) at the time of the fire.

¶ 8 As authorized by section 1H-30(3) of the Financial Oversight Panel Law (105 ILCS 5/1H-30(3) (West 2014)), the FOP employed Todd Drafall to serve as chief fiscal officer. In that capacity Drafall possessed "all of the powers and duties of the district's chief school business official" and had responsibility for any other duties regarding financial matters assigned to him by the FOP. *Id.* As required by statute, Drafall reported to the FOP rather than the District when carrying out those responsibilities. *Id.* § 1H-30.

¶ 9 Restore Construction, Inc., is an Illinois corporation engaged in the business of, among other things, repairing fire-damaged structures and providing related construction services. It shares common ownership and management with Restore Restoration, Inc., which provides disaster mitigation and related restoration services. Shortly after the fire, Restore Construction was contacted by representatives of the District and asked to provide emergency mitigation services at Proviso East. Restore had provided similar service to the District in the past and was recognized by the District as possessing a high degree of professional skill.

¶ 10 The District's customary practice when contracting for repair and payment of losses covered by its property loss insurance was to proceed without a recorded vote of its Board. The loss in question here was covered by the District's insurance—as a member of the Collective Liability Insurance Cooperative it was insured by Travelers Indemnity Company (Travelers)— and that is how it handled the emergency mitigation and repair work following the Proviso East fire. Promptly after the fire took place, representatives of the District contacted Restore to request emergency mitigation services and advised Restore that the District "would approve contracting with Restore Restoration to mitigate and remediate damage due to the fire and with Restore Construction to repair the property loss damage to the School."

¶ 11 On May 22, 2014, the District's superintendent, Collins-Hart, executed two contracts, one with Restore Restoration to mitigate and remediate fire damage and the other with Restore Construction to repair the fire-damaged school. Both contracts were signed by Collins-Hart and represented by her to be on behalf of the District. The District also hired Legat Architects, Inc. (Legat), an Illinois corporation engaged in the business of providing professional architectural services, to prepare plans and work specifications for the fire damage renovations and to act as contract administrator on the project.

¶ 12 The project manual prepared by Legat set out the responsibilities of all participants in the project, including the District, Legat, Restore, and Travelers. At the direction of the District, the specifications prepared and issued by Legat also incorporated statutory labor wage standards and rates. This was done pursuant to a policy adopted by the Board in June 2014 and approved by the Board's president.

¶ 13 The hiring of Legat and adoption of the specifications were affirmed by Collins-Hart. In addition, Drafall, the FOP's chief fiscal officer, attended construction meetings on the project, either in-person, via telephone conference, or through a designee, and accepted and approved as fair and reasonable numerous subcontracts, quotations, bids, sales orders, change orders, and invoices for the project. At Drafall's direction, the District's project manager, Ron Anderson, executed and approved as fair and reasonable additional work. The District's buildings and grounds manager did so as well. According to Restore's complaint, this was all done with the District's knowledge and consent. In addition, in August 2014, the Board's president signed an amended agreement with Restore, governing repair of the fire damage at the school. An affidavit signed by Drafall and attached as an exhibit to Restore's complaint states that he reviewed and initialed both the amended agreement and the two contracts previously signed by the superintendent.

¶ 14 Restore performed the emergency mitigation and repair work it was hired to do in accordance with the specifications prepared by Legat and approved, adopted, and implemented by the District and its insurers, including Travelers. Restore was paid in part and expected to be paid in full for its work on the school through the Travelers policy covering the District's loss. Restore dealt directly with the claims administrator for Travelers, and Restore was paid for its work through the District's insurers. Where insurance checks were issued to the District, the District would endorse the checks over to Restore.

¶ 15 Throughout the course of the project, Drafall provided regular updates to the Board and the FOP on the work that was being done. The Board participated in the Project by, among other things, having District employees, Legat, and other hires attend construction meetings and report back to it. Neither the Board nor the FOP ever disapproved of any actions taken by Drafall or District employees acting on the Board's behalf. To the contrary, all actions of Drafall on the project were accepted by both the Board and the FOP.

¶ 16 According to the complaint, although there was no recorded vote, "[n]o less than a majority of the Proviso Board knew and informally approved that Restore provide mitigation, remediation, restoration and repairs to the School," Throughout the course of the project, there was never any question as to the validity of the agreements governing the work, the reasonableness of the charges, or the quality of the repairs and restoration services provided by Restore. The only dispute concerned reluctance by one of the District's insurers to reimburse Restore for the wages of its workers at the prevailing wage rates set by statute,

incorporated into the specifications prepared by Legat, and approved by the Board. The underpayment attributable to this refusal amounted to $556,420.12, a sum for which Restore's lawyers demanded payment pursuant to the parties' contract. In responding to that demand, counsel for the District acknowledged that the District had signed a contract for the work and that under that agreement Restore was to do the work for the amount the insurance company agreed to pay.

¶ 17        The last day Restore performed work on the project was July 3, 2015. The total value of the mitigation, remediation, and repairs performed by the company on behalf of the District exceeded $7,271,000. It received payment for all but approximately $1,428,000 of this sum, and all of the payments it did receive were made by the District's insurers. No part of the repair work was paid for using funds drawn from District accounts.

¶ 18        When it appeared that full payment would not be forthcoming, Restore brought this action in the circuit court of Cook County to recover what it was still owed, up to the amount covered by the District's insurance. Restore's complaint, as finally amended, contained 22 counts and was directed against numerous defendants, including the District, the District's superintendent and principal, and the District's insurance carriers. All 22 counts were ultimately dismissed. This appeal concerns only the viability of counts I and II. Both of those counts sought recovery from the District based on *quantum meruit*. Count I was asserted by Restore Construction, while count II was brought by Restore Restoration, but otherwise the theory and facts underlying the two counts were the same.

¶ 19        As noted at the outset of this opinion, the District moved to dismiss both counts pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018)). The crux of its motion was that it had no obligation to pay Restore for what it still owed under the contracts because those contracts had not been let out for bid and approved by a majority vote of the Board. Although Restore's complaint alleged that "[n]o less than a majority of the Proviso Board knew and informally approved that Restore provide mitigation, remediation, restoration and repairs to the School" and that the FOP knew and accepted the work as well, the District disputed that contention and submitted documentation aimed at establishing (1) that the written agreements with Restore were not placed on the Board's agenda, were never presented to the Board for approval, were never voted on by the Board, and were never even discussed by the Board; (2) that the work that was the subject of the agreements was never formally bid; and (3) that the Board had not, in fact, "approved any bills or invoices for work Restore performed at Proviso East High School."

¶ 20        The District's theory was (1) that bidding and a formal vote by the Board were required by the School Code, (2) that the failure to follow them rendered the agreements with Restore *ultra vires* and void, and (3) that where, as here, an agreement is *ultra vires* based on failure to comply with a statute prescribing the method by which a school district may be bound by contract, the district cannot be held liable under any theory, including *quantum meruit*. Any obligation to pay is completely negated, notwithstanding any benefits the school district may have received.

¶ 21        The primary document submitted by the Board in support of its position was an affidavit from Theresa Kelly, one of the Board's seven members, to which were appended agendas and minutes for meetings convened by the Board and the FOP around the time the pertinent agreements were executed. Those particular agendas and minutes do not specifically refer to

any bids, discussion, or votes on the agreements for repair and restoration work at Proviso East. In fact, based on those agendas and minutes alone, one would not know that Proviso East had even sustained a major fire.

¶ 22    Of course, the Board is not arguing that it lacked actual knowledge that one of the District's three schools had sustained millions of dollars in damage and that Restore had been hired to handle the repairs. Such a claim could not have been made in good faith. The agendas referenced by Kelly's affidavit show that the Board's meetings regularly included "capital and construction updates" by the superintendent. Moreover, agendas and minutes from later Board meetings that appear elsewhere in the record contain regular and detailed updates on the magnitude and status of what is referred to as the "Proviso East Fire" or "East Fire Damage" project. Those documents reflect discussion and questioning by the members of the Board regarding details of the work done by Restore, including, on one occasion, specific questioning by Kelly herself about the progress of work on affected classrooms.

¶ 23    Agendas of the FOP's meetings likewise show that "capital and construction" updates, including "Proviso East Fire" updates, were a regular part of those meetings. Moreover, Drafall, the FOP's chief fiscal officer, stated in his affidavit:

> "In my capacity as FOP's Chief School Business Official for the District, I gave regular updates to either or both the Board of Education of Proviso Township High Schools District 209 and/or to the Financial Oversight Panel for Proviso High School District 209 (FOP) at meetings held on May 13, 2014, June 10, 2014, July 15, 2014, August 12, 2014, September 16, 2014, October 14, 2014, November 18, 2014, December 9, 2014, January 13, 2015, February 10, 2015, March 10, 2015, May 12, 2015."[1]

¶ 24    The Board's position is narrower and more technical. In its view, the fatal flaw is not that it did not know what was going on. It was that the specific contracts were not let out for bid and approved in advance by a formal vote of the Board. Without those steps, which the Board contends were required by the School Code under the circumstances presented here, it argues that the agreements were void *ab initio* and that it was not bound to pay Restore anything for the work subsequently performed by the company on behalf of the District.

¶ 25    To be sure, this outcome may leave the Board—and the taxpayers in the District—with a windfall. Under the Board's theory, however, that is immaterial. In their view, the overriding consideration is ensuring that the statutory bidding and approval procedures are followed. Although there are no allegations of self-dealing, fraud, or dishonesty in this case, the Board contends that enforcement of the formal bidding and approval process is necessary to protect taxpayers from the evils the statutory requirements were designed to prevent. To hold otherwise, they argue, would mean "that the legal protections built in for the taxpayer would be obviated and the unlawful expenditures of public funds would be authorized without the approval of the locally-elected representatives tasked with protecting the public's interest and whom can be held accountable by the same." Too bad for Restore, perhaps, but in the Board's

_____

[1]We note that the agenda for the August 12, 2014, special joint meeting of the Board and the FOP also references a resolution approving issuance of over $1.3 million in debt certificates to cover altering, repairing, and equipping the Proviso East building. The relationship, if any, between these expenses and the fire-related work performed by Restore has not been explained.

- 6 -

view, it was the company's responsibility in the first instance to make sure that the people it was dealing with had proper authorization before proceeding.

While the circuit court was persuaded by these arguments, the appellate court was not. Although it agreed that the contracts in question were void *ab initio* because they had not been subjected to competitive bidding and were not voted upon by the Board (2019 IL App (1st) 181580, ¶ 26), it held that this did not bar Restore from asserting a claim based on a contract implied in law for the value of the work performed in reliance on the presumed agreements. The appellate court noted that the parties had not cited and it had not found "any case that holds that recovery under *quantum meruit* is barred where the intended contract with a municipal unit has been determined to be void *ab initio*," and it declined to make such a holding for the first time in this case. *Id.* ¶ 42. Rather, it concluded that "allowing plaintiffs' claims to proceed is consistent with principles of equity and the well-settled reasoning that a contract implied in law 'exists independent of any agreement or consent of the parties' and that 'no one may unjustly enrich himself at another's expense.' " *Id.* (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mutual Insurance Co.*, 2018 IL App (1st) 163351, ¶ 16). It therefore reversed the circuit court's judgment granting the Board's section 2-619 motion to dismiss and remanded for further proceedings. *Id.* ¶¶ 43-46. The Board petitioned for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)), which we allowed, and the matter is now before us for review.

¶ 27                                               ANALYSIS

¶ 28     *Quantum meruit*, the theory on which counts I and II of Restore's third amended complaint are premised, is based on the implied promise of a recipient of services to pay for those services that are of value to it and lies where the recipient would be unjustly enriched if it were able to retain the services without paying for them. *In re Estate of Callahan*, 144 Ill. 2d 32, 40 (1991). The Board does not dispute that counts I and II properly plead those elements. Rather, it challenged the viability of Restore's cause of action by means of a motion to dismiss under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018)).

¶ 29     Such a motion admits the legal sufficiency of the plaintiff's complaint but asserts that the claim against the defendant is barred by some affirmative matter that avoids the legal effect of or defeats the claim. Where, as here, we review a judgment dismissing a claim under the statute, we afford no deference to the determinations by the lower courts. Whether a section 2-619 motion was properly granted presents a question of law. Our review is therefore *de novo*. *In re Estate of Boyar*, 2013 IL 113655, ¶ 27.

¶ 30     As our earlier discussion indicated, the "affirmative matter" claimed by the Board to be fatal to Restore's cause of action in this case is the lack of competitive bidding and the absence of a formal, recorded vote by the Board to approve the contracts for emergency repair and restoration of Proviso East before Restore began the work for which it is now seeking payment. The Board contends that these steps were indispensable under the following sections of the School Code:

> (1) section 10-20.21(a) (105 ILCS 5/10-20.21(a) (West 2014)), which authorizes school boards "[t]o award all contracts for purchase of supplies and materials or work involving an expenditure in excess of $25,000 or a lower amount as required by board policy to the lowest responsible bidder, considering conformity with specifications,

- 7 -

terms of delivery, quality and serviceability, after due advertisement," subject to 16 enumerated exceptions;

(2) section 10-7 (*id.* § 10-7), which requires the board's secretary or clerk to record the board's official acts and specifies that "[o]n all questions involving the expenditure of money, the yeas and nays shall be taken and entered on the records of the proceedings of the board"; and

(3) section 10-12 (*id.* § 10-12), which provides that "[a] majority of the full membership of the board of education shall constitute a quorum" and that "[u]nless otherwise provided, when a vote is taken upon any measure before the board, a quorum being present, a majority of the votes of the members voting on the measure shall determine the outcome thereof."

¶ 31        The Board's position is problematic for two basic reasons. First, in focusing on statutory provisions applicable to regularly elected school boards, it fails to take into account that at all relevant times, the District was operating under the fiscal management of a Financial Oversight Panel established by the State Board of Education because the District was financially troubled. By law, the FOP was empowered to exercise financial control over the District. *Id.* § 1H-25. This authority included the power "to make, cancel, modify, or execute contracts (other than collective bargaining agreements), leases, subleases, and all other instruments or agreements necessary, convenient, or otherwise beneficial to the district and consistent with the powers and functions granted by [the Financial Oversight Panel Law] or other applicable law" (*id.* § 1H-25(a)(2)) and "to approve all contracts and other obligations as the Panel deems necessary and appropriate" (*id.* § 1B-6(i) (applicable pursuant to sections 1H-15(b)(2) and 1H-25(a) of the Financial Oversight Panel Law (*id.* §§ 1H-15(b)(2), 1H-25(a)))). Correspondingly, the Board was prohibited from entering into any contract or obligation unless the contract was consistent with the financial plan and budget then in effect. *Id.* § 1B-14(a). In addition, the FOP was authorized to identify categories and types of contracts subject to its approval and to regulate the procedure for obtaining that approval (*id.* § 1B-14(b)).

¶ 32        The allegations in Restore's third amended complaint and the supporting affidavit from the FOP's chief fiscal officer indicated that the FOP was fully apprised of the emergency repair and restoration work performed by Restore at Proviso East and of the details of the contracts governing that work and that it fully approved the project.[2] Accepting that as true for the purposes of this appeal, we fail to see, and the Board has not explained, how the actions it took or failed to take with respect to the approval of the contracts were relevant to Restore's entitlement to be paid. Under the Financial Oversight Panel Law, it would appear that it was the actions of the FOP, not the Board, that were dispositive. Based on the record and arguments

_____

[2]While the record before us does not include recorded votes by the members of the FOP, we have not found anything in the governing provisions of the School Code that required recorded votes. The statute provides simply that three members of the FOP constitute a quorum and that a majority of members being present is required to pass a measure. 105 ILCS 5/1H-20(f) (West 2018). Nothing before us suggests these requirements were not met here. We further note that the law also provides that, where a contract requiring FOP approval is submitted by a school board, it will be considered approved if the FOP does not reject it within 30 days, unless the FOP advises the board that it needs more time to decide. *Id.* § 1B-14(d). Accordingly, in some circumstances, no affirmative action by the FOP is even necessary.

before us, we have no basis for holding that any aspect of the FOP's handling of the Proviso East project would warrant depriving Restore of the sums it earned for the work it did on behalf of the District and its taxpayers. To conclude otherwise would be tantamount to holding that Restore must suffer a forfeiture of the balance it is due based solely on how the Board implemented the very type of financial decisions that the State Board of Education had determined, through establishment of the FOP, that it could no longer be trusted to make without proper oversight. Nothing in the statutes or common law of Illinois would support such an anomalous result.

¶ 33     Second, even if the FOP were not in place, the Board's legal theory could not be sustained. This case does not present a situation involving the authority of a municipal employee to bind a municipality as discussed in cases such as *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148. At issue here is the action by the Board itself. As we have already discussed, the Board's position is that (1) because it did not follow the provisions of the School Code noted earlier requiring competitive bidding for contracts over $25,000 and a formal vote to approve such contracts, its agreements with Restore are void *ab initio*, and (2) where an agreement with a municipal corporation is void *ab initio*, no contract or liability may be implied against that entity, and no recovery may be had against it based on *quantum meruit*.

¶ 34     The Board's theory is rooted in case law holding that, because school districts and other municipal corporations exercise limited powers, any action they take beyond their lawful authority is *ultra vires*. See *Lewis-Connelly v. Board of Education of Deerfield Public Schools, District 109*, 277 Ill. App. 3d 554, 560 (1996); *Clark v. School Directors of District No. 1*, 78 Ill. 474, 476-77 (1875). In advancing that argument here, the Board presumes that its authority is limited to the specific powers enumerated in section 10-20.1 and following sections of article 10 of the School Code (105 ILCS 5/10-20.1 *et seq.* (West 2014)), including the power to let contracts in the manner set forth in section 10-20.21 (*id.* § 10-20.21). The Board overlooks, however, that section 10-20 of the School Code specifically provides that, while school boards possess the powers enumerated in aforementioned sections, "[t]his enumeration of powers is not exclusive." *Id.* § 10-20. Rather, boards are permitted to exercise all other powers not inconsistent with the School Code "that may be requisite or proper for the maintenance, operation, and development of any school or schools under [their] jurisdiction." *Id.*

¶ 35     Perhaps the Board thought section 10-20 was of no relevance because it believed the procedures it followed in this case *were* inconsistent with the School Code and therefore outside its authority under section 10-20's broad grant. That proposition is subject to some debate. While there may have been no competitive bidding for the project, Restore's complaint alleges that it was initially retained to provide emergency mitigation services and that the work was subsequently approved by the Board, albeit informally. Under section 10-20.21(a)(xiv) of the School Code, the expenditure of funds for emergencies is expressly exempted from the normal bidding process where approval by three-quarters of the board's members is obtained. *Id.* § 10.21(a)(xiv).

¶ 36     In any event, the fact that the Board may not have strictly complied with the bidding and approval procedures does not doom Restore's right to seek payment. Our court has long recognized a distinction between contracts that are *ultra vires* because the municipal corporation had "no power to contract, whatsoever," and those situations where the municipal corporation had the power to enter into a contract but the contract is irregularly or illegally

made. Where a contract has been made in a way that does not conform to the law but is of the type that was within the power of the municipal corporation to make, the contract has been performed in good faith, and the municipal corporation has accepted its benefits, the municipality cannot invoke its own failure to comply with legal requirements as basis for defeating recovery. *Branigar v. Village of Riverdale*, 396 Ill. 534, 542-43 (1947); *McGovern v. City of Chicago*, 281 Ill. 264, 280 (1917); accord *Lyon Financial Services, Inc. v. Illinois Paper & Copier Co.*, 247 F. Supp. 3d 923, 937-38 (N.D. Ill. 2017) (applying Illinois law).

¶ 37    These principles are fully applicable here. While the actions taken by the Board in handling the emergency repair and restoration work at Proviso East may not have comported with the procedures set forth in the School Code, hiring a contractor to do such work, as the Board did here, is unquestionably among the types of action Illinois school boards are authorized to undertake. The contractor, Restore, performed its obligations in good faith, and the Board willingly accepted the benefits of Restore's efforts without question or complaint.

¶ 38    Illinois courts have similarly recognized that the failure of a governmental unit to comply with the required methods for awarding contracts is not fatal to a plaintiff's right to recover based on principles of quasi-contract or contract implied in law. *Karen Stavins Enterprises, Inc. v. Community College District No. 508*, 2015 IL App (1st) 150356, ¶ 7; *Woodfield Lanes, Inc. v. Village of Schaumburg*, 168 Ill. App. 3d 763, 769 (1988). "The essence of a cause of action based upon a contract implied in law is the defendant's failure to make equitable payment for a benefit that it voluntarily accepted from the plaintiff." *Karen Stavins Enterprises*, 2015 IL App (1st) 150356, ¶ 7. Even where a governmental unit has not complied with its policies and procedures for awarding contracts, recovery may be had against it if the plaintiff can show that it furnished valuable goods or services, which the defendant received under circumstances that would make it unjust to retain without paying a reasonable sum in compensation. *Id.*

¶ 39    Again, based on the allegations of Restore's complaint, these circumstances would seem to be present here. Restore expended considerable sums in good faith on behalf of the Board with the entirely reasonable expectation that it would be paid, as it had been in the past. It fully performed its responsibilities as promised and received partial payment along the way. The Board was regularly updated on the progress of the project and willingly accepted the fruits of Restore's efforts with no objection or complaint. Now that the work is complete, there is no way for Restore to take it back. To permit the Board to reap the benefits of Restore's efforts without paying the remaining amounts it owes would result in a substantial windfall to the District and its taxpayers and a substantial loss to Restore.

¶ 40    In asking us to overturn the appellate court's decision in favor of Restore, the Board spends considerable effort arguing that reversal is necessary to protect taxpayer's funds from "frauds, thefts or other schemes of unscrupulous vendors or public officials" and that to hold otherwise "opens local taxpayers to numerous forms of misconduct." We reject this contention.

¶ 41    For one thing, the statutory requirements for competitive bidding and formal vote were enacted by the legislature to protect bidders and taxpayers, not school boards. The Board here has no standing to invoke those provisions as grounds for evading its obligation to pay what it owes. See *East Peoria Community High School District No. 309 v. Grand Stage Lighting Co.*, 235 Ill. App. 3d 756, 762 (1992).

¶ 42    For another, so far as we can tell based on the limited record before us, any misconduct in this case was on the part of the Board, not Restore or any other entity or person involved in the project. The work performed by Restore and the reasonableness of the amounts it charged were subject to multiple levels of oversight and are unquestioned. The mistakes were the Board's alone. A fundamental precept of Illinois law is that no one shall be permitted to take advantage of his own wrong. *Loeb v. Gendel*, 23 Ill. 2d 502, 505 (1961). Allowing the Board to escape responsibility for paying what it owes based on its own misconduct would directly contravene this core principle and reward school districts for failing to adhere to the law. That is not a precedent we should set, particularly where, as here, the school board has had such difficulty managing its own financial affairs that it has been forced to operate with State oversight for more than a decade.

¶ 43    And finally, contrary to the Board's contention, allowing Restore to recover the amount to which it is entitled for the work it did on behalf of the Board under the circumstances alleged here presents no "risk of a raid on the public treasury." None of the money for this project has come from public funds. It has all been paid by the Board's insurers, and Restore has made clear that any further recovery "would be limited to the amount of [the Board's] applicable insurance coverage and that the Board would not be obligated to pay funds to Plaintiffs from any other source."

¶ 44                                CONCLUSION

¶ 45    For the foregoing reasons, we agree with the appellate court that the Board has failed to establish the existence of affirmative matter sufficient to defeat the *quantum meruit* claims asserted by Restore in counts I and II of its third amended complaint. The appellate court was therefore correct when it reversed the judgment of the circuit court granting the Board's section 2-619(a)(9) motion to dismiss those counts and remanded to the circuit court for further proceedings. Accordingly, the appellate court's judgment is affirmed.

¶ 46    Appellate court judgment affirmed.

¶ 47    Circuit court judgment reversed.

¶ 48    Cause remanded.

¶ 49    JUSTICE GARMAN, dissenting:

¶ 50    Because the Board failed to follow the requirements of the School Code in the approval of the contracts at issue, thereby rendering those contracts void *ab initio*, I would find Restore cannot succeed under a claim of *quantum meruit*. Moreover, I believe the majority erroneously relies on the presence of the FOP while, at the same time, it ignores those that the provisions of the School Code are ultimately designed to protect—the taxpayers. Therefore, I respectfully dissent.

¶ 51    First, the majority notes the School Code requires that, when the Board seeks to award contracts in excess of $25,000, it must engage in a competitive bidding process (105 ILCS 5/10-20.21(a) (West 2018)) and formalize the contracts through a recorded vote by a majority of the members (*id.* §§ 10-7, 10-12). Neither of these requirements was met in this case.

¶ 52    In considering municipal contracts and the statutory requirements to execute those contracts, this court has stated as follows:

"Where there is a statute or ordinance prescribing the method by which an officer or agent of a municipal corporation may bind the municipality by contract, that method must be followed, and there can be no implied contract or implied liability of such municipality. Where the agents of a city are restricted by law as to the method of contracting, the city cannot be bound otherwise than by a compliance with the conditions prescribed for the exercise of the power." *Roemheld v. City of Chicago*, 231 Ill. 467, 470-71 (1907).

In these situations, "where a municipality exceeds its statutory authority in entering into a contract, the municipality's act is *ultra vires*, and the resulting contract is void *ab initio*." *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 28; see also *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 166 Ill. App. 3d 361, 366 (1988) (stating " 'a municipal corporation cannot be obligated upon an alleged implied contract which is *ultra vires*, *contrary to statutes or charter provisions*, or contrary to public policy.' " (Emphasis in original.) (quoting 10 Eugene McQuillin, The Law of Municipal Corporations § 29.111(a), at 514 (3d ed. rev. 1981))). This court has found "[t]he doctrine of *ultra vires* is applied with greater strictness to municipal bodies than to private corporations." *Hope v. City of Alton*, 214 Ill. 102, 106 (1905). Moreover, "[a] person dealing with a municipal corporation is charged with the knowledge of the limitations of the power of that corporation for any contract attempted to be entered into by any of its officials." *May v. City of Chicago*, 222 Ill. 595, 599-600 (1906); *Hope*, 214 Ill. at 106.

¶ 53    In this case, Restore was chargeable with notice of the statutory requirements the Board had to take to execute the contracts in question, and those requirements were undoubtedly not followed. As such, the contracts are void *ab initio* and cannot be enforced. Even though the Board is not without blemish here,

> "[t]o now permit the plaintiff to have a recovery would be to permit it to do indirectly what it could not lawfully do directly, and would permit the plaintiff to profit from its own unlawful acts. The law furnishes no relief to parties under such circumstances, but leaves them where it finds them." *Galion Iron Works & Manufacturing Co. v. City of Georgetown*, 322 Ill. App. 498, 505 (1944).

¶ 54    Second, I disagree with the majority when it concludes it is the action of the FOP, not the Board, that is dispositive here. The FOP has the authority to approve all contracts made by the Board. *East St. Louis Federation of Teachers, Local 1220, American Federation of Teachers v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 409 (1997). However, the Board failed to properly execute the contracts, and the FOP could not ratify void contracts. See *D.C. Consulting Engineers, Inc. v. Batavia Park District*, 143 Ill. App. 3d 60, 63 (1986) (stating a void contract cannot be validated by principles of ratification or estoppel).

¶ 55    Moreover, that Drafall, as the FOP's chief fiscal officer, initialed contracts on its behalf does not somehow validate the contracts. According to section 1H-25(a)(2) of the School Code, the FOP has the authority "to make, cancel, modify, or execute contracts." 105 ILCS 5/1H-25(a)(2) (West 2018). However, nothing indicates *the FOP* entered into the contracts at issue. Also, the chief fiscal officer only has "the powers and duties of the district's chief school business official and any other duties regarding budgeting, accounting, and other financial matters that are assigned by the Panel, in accordance with this Code." *Id.* § 1H-30(3). Only the

Board has the authority to execute contracts, and a district's chief school business official does not possess similar authority.

¶ 56     Third, the majority gives short shrift to any considerations of the taxpayers. As this court has stated, " '[i]f the unauthorized acts of a governmental employee are allowed to bind a municipality ***, the municipality would remain helpless to correct errors' [citation] or, worse, to escape the financial effects of frauds and thefts by unscrupulous public servants." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 36. Thus, "[a] municipal corporation is not estopped from denying the validity of a contract when there was no authority for making it. To hold otherwise would be to expose the tax-payer to all the evils which statutes or ordinances passed for his protection were designed to prevent." *Hope*, 214 Ill. at 106.

¶ 57     The School Code's requirements protect the taxpayers from under-the-table arrangements, sweetheart deals, and backroom graft. See *Smith v. F.W.D. Corp.*, 106 Ill. App. 3d 429, 431 (1982) (stating "[t]he purposes behind requiring governmental units to engage in competitive bidding are to '[i]nvite competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable' " (quoting 10 Eugene McQuillin, Municipal Corporations § 29.29, at 302 (3d ed. rev. 1981))). If, however, agents of a municipal entity can forgo the requirements and bind their employer, "then the provisions of the statutes prescribing and limiting the manner in which the [entity] can become indebted are meaningless." *Gregg v. Town of Bourbonnais*, 327 Ill. App. 253, 267 (1945). The majority's decision disregards these concerns and puts future taxpayers on the hook, so long as an emergency exists and the service provider acts in good faith. Given the amount of money in projects such as these, I do not believe we should so easily dismiss the requirements of the statute and the valid interests of those who will have to pay the bill.

¶ 58     Because the Board failed to comply with the statute, I would find that the contracts are void *ab initio* and that Restore cannot recover under a theory of *quantum meruit*. Thus, I would reverse the appellate court's judgment and affirm the circuit court's judgment.

¶ 59     JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.