**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190607-U

Order filed September 2, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| JOHN COLT LANDRETH, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | La Salle County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0607 |
| MYERS, BERRY, O'CONNOR & KUZMA, | ) | Circuit No. 15-L-70 |
| LTD., an Illinois corporation; STEPHEN C. | ) | |
| MYERS; and SHERYL H. KUZMA, | ) | |
| | ) | Honorable Troy D. Holland, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Holdridge and O'Brien concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in granting summary judgment in favor of defendants.

¶ 2    Plaintiff, John Colt Landreth, appeals the trial court's order granting defendants', Myers, Berry, O'Connor & Kuzma, Ltd., Stephen C. Myers, and Sheryl H. Kuzma, motion for summary judgment. Landreth contends that the trial court erred in finding that no issue of material fact existed as to defendants' alleged legal malpractice. We affirm.

## I. BACKGROUND

On August 5, 2003, Landreth entered into a "Consulting, Development, and Marketing Agreement" (Agreement) with the city of Ottawa. The Agreement stated that both Ottawa and Landreth agreed to jointly utilize the law firm of Pool, Leigh & Fabricius (PLF). Pursuant to the Agreement, Landreth would provide Ottawa with consulting, development, and marketing services to increase and promote the commercial, industrial, and economic base of the city. Landreth's services included advertising and promotion of Ottawa and Ottawa's Industrial Park (OIP). The recitals to the Agreement stated that Ottawa owned real property within the OIP Tax Increment Financing (TIF) district and that Landreth had an expertise in economic development. Ottawa agreed to pay Landreth $5000 monthly retainers, up to $2000 per month in expenses, up to $28,900 each year for web hosting, advertising and miscellaneous, and 1.5% of all actual project costs of all industrial developments occurring within the city of Ottawa during the Agreement. In addition, "[c]ompensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon." The Agreement included a recital that the parties intended for it to be duly authorized, binding, valid, enforceable, and not violative of existing law.

The Agreement did not include a provision which limited the source of Landreth's payments to any specific TIF or special revenue fund. The Agreement also did not exempt or otherwise protect Ottawa from having to pay Landreth in the event TIF or special revenue funds were unavailable. However, for a two-year period Ottawa made payments to Landreth from TIF funds.

On February 2, 2007, Landreth filed a breach of contract complaint against Ottawa. Landreth was represented by Myers, Berry, O'Connor & Kuzma, Ltd., Stephen C. Myers, and

Sheryl H. Kuzma (MBOK). The complaint alleged that Ottawa breached the Agreement in that it failed to pay Landreth for a PetSmart development as well as additional fees and expenses. Landreth sought $450,000 in damages.

¶ 7 Ottawa filed a motion to dismiss Landreth's complaint. Ottawa argued the Agreement violated section 8-1-7(a) of the Illinois Municipal Code (Code) (65 ILCS 5/8-1-7(a) (West 2014)). Specifically, Ottawa claimed that it did not previously make an appropriation concerning the Agreement. Ottawa attached an affidavit which showed that the 2004 budget and appropriation did not contain an appropriation for the Agreement. Without such an appropriation, Ottawa argued the Agreement violated section 8-1-7 of the Code. As such, Ottawa asserted that the failure to do so rendered the Agreement void.

¶ 8 On February 28, 2008, the trial court held a hearing on Ottawa's motion to dismiss. The trial court found section 8-1-7 of the Code barred the action because no prior appropriation existed for the contract. Therefore, the court dismissed Landreth's complaint.

¶ 9 Landreth did not appeal the decision. Instead, MBOK pursued tort claims against Ottawa, PLF, and its individual attorneys. During the pendency of the action, MBOK's lead litigation counsel died in a motor vehicle accident. Landreth retained the law firm Peel and Rachlis to pursue his claims.

¶ 10 On November 2, 2012, Landreth filed a third amended complaint against attorney Leigh, attorney Kopko, the law firm of Pool, Leigh & Kopko, the law firm of Pool & Leigh, P.C., the law firm of Pool, Leigh & Fabricius, and the city of Ottawa. The complaint alleged claims of fraud, breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, professional negligence, respondeat superior and vicarious liability, negligent misrepresentation, and unjust enrichment.

The complaint sought $1.4 million in compensatory damages, $6 million in unjust enrichment, and punitive damages.

¶ 11        Ottawa moved to dismiss Landreth's unjust enrichment claim on the basis that section 8-1-7 prohibited Ottawa from paying Landreth on the Agreement under a contractual theory. The trial court agreed, and noted the prior court's finding, "We know that the contract was void in its entirety. That is what was ruled by Judge Lanuti in 2008. *** I adopt the City's position in part, that 8-1-7 would prohibit the payment for this added value benefit that the City received." The trial court, however, permitted Landreth to pursue his remaining claims.

¶ 12        The action did not proceed to trial. Instead, Landreth settled his claims against attorney Leigh. He received a $79,000 payment from Leigh. He also received a confession of judgment in the amount of $1,451,062 that could be enforced against Ottawa. Landreth ultimately settled with Ottawa for $410,000. Landreth also sought to recover from attorney Leigh's former partner, Fabricius. Landreth obtained a default judgment in the amount of $957,719.57. This court affirmed the default judgment on appeal. See *Landreth v. Raymond P. Fabricius, P.C.*, 2018 IL App (3d) 150760.

¶ 13        On March 11, 2013, Landreth filed a legal malpractice complaint against MBOK, which is the subject of this appeal. Landreth alleged that MBOK committed malpractice in its representation of Landreth in the breach of contract action against Ottawa. In that case, the claim was dismissed on the basis that the Agreement was void for violating section 8-1-7 of the Code. The complaint asserted four malpractice claims: (1) MBOK was negligent in failing to raise the special fund exception in opposition to Ottawa's motion to dismiss in the contract suit; (2) MBOK was negligent for failing to raise the alternative contracting authority provided by the TIF act in opposition to Ottawa's motion to dismiss; (3) MBOK was negligent in strategically deciding not

to raise the special fund exception or TIF Act in opposition to Ottawa's motion to dismiss; and (4) MBOK was negligent in its handling of Landreth's tort lawsuits.

¶ 14 Discovery ensued. Landreth testified in his deposition that the Agreement did not specify where Ottawa's funds would come from to pay him. He also testified as follows:

"Q: Okay. Did you know whether or not there had been money set aside to pay your fees under the August 5, 2003 contract—

A: Yes.

Q: —at the time you signed it?

A: Yes.

Q: And what was your understanding at the time you signed the agreement, as to how you would be paid?

A: Ottawa TIF Fund.

Q: Okay. Out of what specific TIF Funds?

A: Well, there were several TIF funds in Ottawa. So if it was in the Ottawa Industrial Park, it would be the Ottawa Industrial Park TIF, or the East TIF Fund.

Q: Okay.

A: If it was the I-80, where PetSmart was, it would be funded out of the I-80 TIF.

Q: And does it say anywhere in your August 5, 2003, contract that you would be paid out of specific TIF funds?

***

A: It does not say a specific TIF fund."

¶ 15    Landreth's testimony continued:

"Q: Did you agree in your contract with Ottawa that Ottawa would only have to pay you out of TIF district funds?

A: No.

Q: Did you ever agree with Ottawa that you would only be paid a fee if TIF district funds were available to pay it?

A: No.

Q: You were to be paid a fee by Ottawa regardless of whether they were eligible for TIF district reimbursement. Correct?

A: I didn't say that.

Q: Well, you expected to be paid your fee whether there was a TIF district fund or not?

A: I expected the TIF funds to pay the fee, and I expected them to have money.

***

Q: *** Did you, or did you not, agree with Ottawa that they would only have to pay you if TIF district funds were available?

A: No. But that was the idea. That was the—that was the arrangement.

Q: Okay. I didn't ask you what the arrangement was. I asked you if you were willing to allow Ottawa to get out of having to pay

you in the event your fees were not eligible for reimbursement in a

TIF district.

A: I didn't think that was a possibility."

¶ 16    Richard Friedman testified as Landreth's expert on municipal contracting. He acknowledged that the plain language of the Agreement did not restrict Landreth's payments to any TIF or special revenue funds established by Ottawa. He also acknowledged that the Agreement did not have any language that prevented Landreth being paid from the city's general fund. However, he opined that the language of the contract implied that the parties intended to limit payments to Landreth from TIF or special revenue funds. Specifically, he stated, "Okay. And as I stated, there is no language expressly to that effect, but interpreting the contract, interpreting its intent, it's clear that it intends that Mr. Landreth's work will be with respect to TIF and that his payments will come from TIF." Friedman noted specific provisions in the Agreement that he believed at least implied such an understanding. For example, the Agreement provided Landreth with a fee of 1.5% of the project costs for each development commenced during the two-year term of the Agreement, or within a year or two of its termination for certain registered prospects, but only if the developments occurred in a TIF district. Additionally, the Agreement provided "[c]ompensation for industrial developments, which occur outside existing TIF districts, will be negotiated on a case by case basis." He further testified that a court would have to reform the Agreement to conform with the expectations of the parties. To reform the Agreement, Friedman opined that a court would have to add language to the Agreement stating that payments made under the contract "shall be solely from TIF revenues."

¶ 17    The affidavit of Shelly L. Monks, the clerk of the city of Ottawa, averred that no funds had been appropriated or budgeted to pay Landreth under the Agreement. The attached budget and

appropriation documents for the city of Ottawa showed that no specific appropriation had been created to pay Landreth under the Agreement.

¶ 18 MBOK filed a motion for summary judgment. MBOK contended that Landreth could not establish the element of proximate cause. In other words, Landreth could not show that anything MBOK did or failed to do caused the court in the contract lawsuit to find the Agreement void pursuant to section 8-1-7 of the Code. MBOK argued that the Agreement was unambiguous, and that parol evidence would not be permitted to interpret the Agreement. The Agreement on its face did not fall under the exception to section 8-1-7 of the Code.

¶ 19 Ultimately, the trial court granted MBOK's motion for summary judgment on the basis that Landreth could not establish that MBOK proximately caused Landreth's injuries. In particular, the court found the Agreement to be unambiguous. Since the Agreement did not limit Landreth's payment to any special revenue fund or TIF fund, the court found the Agreement violated section 8-1-7 of the Code. Therefore, the court concluded that MBOK could not have successfully pursued the breach of contract action even if it did raise any exception to section 8-1-7 of the Code. In coming to its conclusion, the court applied the four corners rule and declined Landreth's request to consider parol evidence to aid in interpreting the Agreement.

¶ 20 II. ANALYSIS

¶ 21 At the outset, during the pendency of this appeal, Landreth filed a motion to strike the appendix to defendants' brief. The appendix contains the transcripts of the May 25, 2012, hearing on Ottawa's motion to dismiss Landreth's unjust enrichment claim in the tort action against the city and Landreth's original attorneys (*Landreth v. Leigh et al.*, Case No. 2009-L-13). This transcript is not in the record before this court. However, this court may take judicial notice of a written decision that is part of the record of another court because these decisions are readily

verifiable facts that are capable of instant and unquestionable demonstration. See *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37. Landreth does not challenge the authenticity of these transcripts. We deny Landreth's motion and will consider the transcripts in this appeal.

¶ 22 On appeal, Landreth contends the trial court erred in granting defendants' motion for summary judgment. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). In evaluating whether a genuine issue as to any material fact exists, the trial court must construe the pleadings and evidentiary material in the record strictly against the movant and liberally in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Our review is *de novo*. *Pekin Insurance Co. v. Estate of Goben*, 303 Ill. App. 3d 639, 691-92 (1999).

¶ 23 To prevail on a legal malpractice claim, the plaintiff client must plead and prove that the defendant attorneys owed the client a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005) (citing *Sexton v. Smith*, 112 Ill. 2d 187, 193 (1986)).

¶ 24 Where the alleged legal malpractice involves litigation, no actionable claim exists unless the attorney's negligence resulted in the loss of an underlying cause of action. *Tri-G, Inc. v. Burke Bosselman & Weaver*, 222 Ill. 2d 218, 226 (2006). If the underlying action never reached trial because of the attorney's negligence, the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action. *Id.* A legal

malpractice plaintiff must therefore litigate a "case within a case." See *Cedeno v. Gumbiner*, 347 Ill. App. 3d 169, 174 (2004).

¶ 25    In this case, Landreth's argument is premised on his belief that MBOK could have successfully pursued the original contract suit against Ottawa. The court dismissed the suit on the basis that the Agreement violated section 8-1-7 of the Code. Landreth contends MBOK could have successfully opposed Ottawa's motion to dismiss and avoided the effects of section 8-1-7 of the Code. Therefore, to establish proximate cause, Landreth needed to show that he would have been successful if MBOK raised the TIF or special revenue fund exception to section 8-1-7 of the Code. Alternatively, Landreth must show MBOK would have successfully convinced the trial court to reform the Agreement in such a way as to avoid the effects of section 8-1-7 of the Code.

¶ 26    Section 8-1-7(a) of the Code provides, in relevant part,

"Except as provided otherwise in this Section, no contract shall be made by the corporate authorities, or by any committee or member thereof, and no expense shall be incurred by any of the officers or departments of any municipality, whether the object of the expenditure has been ordered by the corporate authorities or not, *unless an appropriation has been previously made concerning that contract or expense.* Any contract made, or any expense otherwise incurred, in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof." (Emphasis added.) 65 ILCS 5/8-1-7(a) (West 2014).

The purpose of the prior appropriation rule of section 8-1-7(a) of the Code is to protect the municipal treasury from incurring liabilities which exceed an appropriation or for which no appropriation was made. *Beling v. City of East Moline*, 14 Ill. App. 2d 263, 272 (1957). The prior appropriation rule is strictly construed. See *Heritage Commons Partners v. Village of Summit*, 730 F. Supp. 821, 824 (1990) (citing *Hogan v. City of Centralia*, 71 Ill. App. 3d 1004 (1979)). There is an exception to this general rule where funding of a multi-year contract is to come from a special assessment fund and not the general fund of the municipality. See *Kinzer v. City of Chicago*, 128 Ill. 2d 437 (1989); *Ligenza v. Village of Round Lake Beach*, 133 Ill. App. 3d 286, 291 (1985). Under these circumstances, no debt is created on the part of the municipality as a contractor cannot pursue the general fund for payments but can only seek a percentage of the special assessments collected. *Id.* An exception to section 8-1-7 only exists when payment of the contract price or incurred expense is limited to a special fund and such payments does not otherwise become an obligation of the municipality. *Kinzer*, 128 Ill. 2d 437.

¶ 27    Here, the plain language of the Agreement contemplated that Landreth would be paid $5000 per month plus expenses to promote general economic development within the entire city of Ottawa, and not just the OIP. The plain language contemplated that Landreth would serve as "the primary economic development organization of the City" and to promote the commercial, industrial, and economic base of the entire city. However, the contract failed to specify the source of the funds to be paid to Landreth for his services. There is no prior appropriation mentioned in the Agreement, nor did the Agreement reference a special fund that would pay Landreth under the Agreement. Put another way, the Agreement did not state that payments to Landreth would be limited to a prior appropriation or special fund. The Agreement, therefore, unambiguously violated section 8-1-7 of the Code in that it binds the city without having a prior appropriation of funds or

a special fund concerning the contract. The failure to create a prior appropriation or limit payments to a special fund placed Ottawa's general fund at risk. As a result, the Agreement was void. Therefore, MBOK could not have successfully argued that the Agreement fell within the exception to section 8-1-7 of the Code during the contract litigation.

¶ 28    In reaching this conclusion, we reject Landreth's contention that the Agreement did not need to include an explicit clause limiting Ottawa's payments to TIF or special revenue funds. In support of this contention, Landreth relies upon *Heritage Commons Partners v. Village of Summit*, 730 F. Supp. 821 (1990). We find *Heritage* distinguishable.

¶ 29    In *Heritage*, the court found that the special revenue exception applied under the facts of that case due to the general fund not being at risk. In addition to passing resolutions to apply for specific grants to assist the plaintiff developer and to sell bonds, the Village further established a TIF district to provide financial incentives for the plaintiff's specific development.

¶ 30    By contrast, the official action of Ottawa in this case consisted only of authorizing the underlying Agreement. The written Agreement, unlike the oral agreement in *Heritage*, did not specify any special assessment, grant or other specific source of funds to pay Landreth. As the Agreement provided, Landreth was to act and receive payment for an economic development role for the entire city and not just the Ottawa Industrial Park. Unlike *Heritage*, the Agreement here placed the general funds at risk. Consequently, *Heritage* is distinguishable.

¶ 31    Despite the unambiguous terms of the Agreement, Landreth contends that the trial court should have considered extrinsic evidence to aid it in interpreting the Agreement under the provisional admission approach. According to Landreth, the extrinsic evidence demonstrated the Agreement contained an ambiguity as to how Ottawa would pay Landreth under the Agreement. Under this approach,

"although the language of [the] contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists which can be found only by looking beyond the clear language of the contract. [Citation.] Under this method, an extrinsic ambiguity exists 'when someone who knows the context of the contract would know if the contract actually means something other than what it seems to mean.' [Citation.] *** [I]f after 'provisionally' reviewing the parol evidence, the trial judge finds that an 'extrinsic ambiguity' is present, then the parol evidence is admitted to aid the trier of fact in resolving the ambiguity." *Air Safety v. Teachers Realty Corp.*, 185 Ill. 2d 457, 463 (1999).

In *Air Safety*, our supreme court recognized this approach, but declined to adopt it. See *id.* at 464. The contract in that case—unlike the present case—contained an integration clause. *Id.* Consequently, the court applied the four corners rule and refused to consider extrinsic evidence. The court went on to decline "to rule on whether the provisional admission approach may be applied to interpret a contract which does not contain an integration clause until such a case is squarely before the court." *Id.* at 464 n. 1.

¶ 32    The supreme court has yet to decide a case on this issue. However, the Second District has declined to adopt the provisional admission approach to contracts without an integration clause. See *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874 (2004); *West Bend Mutual Insurance Co. v. Talton*, 2013 IL App (2d) 120814. The court in *River's Edge* reasoned that "[t]he holding in [*Armstrong Paint & Varnish Works v. Continental Can Co.*, 301

- 13 -

Ill. 102 (1921),] remains binding precedent upon this court." *River's Edge*, 353 Ill. App. 3d at 880. The court in *Armstrong Paint* held:

> "When parties sign a memorandum expressing all the terms essential to a complete agreement, they are to be protected against the doubtful veracity of the interested witnesses and the uncertain memory of disinterested witnesses concerning the terms of their agreement, and the only way in which they can be so protected is by holding each of them conclusively bound by the terms of the agreement as expressed in the writing. All conversations and parol agreements between the parties prior to the written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement." *Armstrong Paint*, 301 Ill. at 106.

¶ 33    We agree with the decisions in *River's Edge* and *Talton*. We decline Landreth's invitation to employ the provisional admission approach and refuse to consider parol evidence to determine the meaning of a facially unambiguous contract. Unless and until our supreme court holds otherwise, we will continue to apply the four corners rule when interpreting unambiguous contracts.

¶ 34    In reaching this conclusion, we reject Landreth's reliance on this court's decision in *In re Marriage of Lewin*, 2018 IL App (3d) 170175. Although this court acknowledged the provisional admission approach, we did not apply it. The contract in question contained an integration clause like the contract in *Air Safety*. *Id.* ¶ 13. Thus, this court did not apply the provisional admission

approach and instead applied the four corners rule. This court did not hold that the provisional admission approach applied to contracts without an integration clause. Consequently, *Lewin* is not persuasive.

¶ 35    Alternatively, Landreth contends that the trial court erred in finding no genuine issue of fact as to whether MBOK could have obtained a reformation of the Agreement in the contract case. According to Landreth, the parties intended to draft the Agreement in a way to limit the source of the funding for the Agreement to comply with section 8-1-7 of the Code. In other words, Landreth contends that the parties intended to limit the payments under the Agreement to TIF or special revenue funds. However, Landreth argues that the parties failed to include this provision in the Agreement. We disagree; the Agreement is unambiguous and there is no evidence of a mutual mistake.

¶ 36    To state a cause of action for reformation of a contract, the Landreth must assert: (1) the existence and substance of an agreement between the parties and the identity of the parties to the agreement; (2) the parties' agreement to reduce their agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) mutual mistake or some other basis for reformation. *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 100 (2005). "A 'mutual mistake of fact' exists for purposes of the reformation of a written instrument, when the contract has been written in terms which violate the understanding of both parties." *In re Marriage of Miller*, 363 Ill. App. 3d 906, 913 (2006) (quoting *In re Marriage of Johnson*, 237 Ill. App. 3d 381, 394 (1992)). Because the thrust of such a claim is that the instrument's language does not accurately reflect the parties' agreement, parol evidence may be introduced on the issue of the parties' intent, "even when the instrument to be reformed is

clear and unambiguous on its face." *Beynon Building Corp. v. National Guardian Life Insurance Co.*, 118 Ill. App. 3d 754, 760 (1983).

¶ 37    Considering the evidence presented, a court would not reform the Agreement. Landreth offered no evidence to demonstrate both parties had an understanding that Ottawa would pay Landreth only from TIF or special revenue funds. As Landreth admitted, the Agreement does not limit his payments to such funds. Although he claimed that the arrangement was for Ottawa to pay him from TIF or special revenue funds, there is no evidence that Ottawa had the same understanding as Landreth when it executed the Agreement. To the contrary, Ottawa never agreed that the Agreement was restricted to TIF or special revenue funds. In the contract lawsuit, Ottawa specifically argued that the Agreement was void under section 8-1-7 of the Code because it did not limit the source of the funds to be used to pay Landreth. Further, while Ottawa paid Landreth with TIF funds over the course of the contract, Ottawa submitted budget and appropriation documents that showed the absence of any specific appropriation to pay Landreth under the Agreement. In fact, the affidavit of the city clerk indicted that no funds had been appropriated or budgeted to pay Landreth. We acknowledge the Agreement included a recital indicating that it was duly authorized, binding, valid, enforceable, and not violative of existing law. However, this does not show that Ottawa intended to limit payments to Landreth to TIF or special funds. In short, there is no evidence Ottawa intended payments under the Agreement to be limited to TIF or special funds. The plain language of the Agreement approved by Ottawa and signed by Landreth unambiguously provided for payment of Landreth's fees without limitation to a specific fund. There is no mutual mistake of fact, and the Agreement would not have been reformed.

¶ 38    In reaching this conclusion, we reject Landreth's claim that the language of the Agreement showed an implied intent of the parties to limit Landreth's payments to TIF or special revenue

- 16 -

funds. For support, Landreth relies on the Agreement's provision which provided Landreth with compensation of 1.5% of project costs within TIF districts. The Agreement also provided that compensation for projects outside of TIF districts would be negotiated on a case-by-case basis. According to Landreth, this language shows that the parties intended compensation for developments that occurred inside TIF districts to be paid from TIF funds. These provisions merely contemplated that Landreth would perform services in and out of TIF districts. These provisions say nothing about the source of the funds to be used to pay Landreth.

¶ 39 We also reject Landreth's reliance on the extrinsic evidence of his negotiations with Ottawa City Engineer and TIF Administrator, Gary Pike. City contracts and expenditures must be made through the formal actions of its council. 65 ILCS 5/8-1-7(a) (West 2018); 65 ILCS 5/3.1-40-40 (West 2014)). "[A]ssurances by city officials, including the mayor, cannot bind the municipality in the absence of approval by a majority vote of the city council." *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146, 153 (1995). Even assuming the negotiations with Pike created an implied understanding as to the source of the funds to be used to pay Landreth, Pike had no authority to bind the city to a contract or expenditure. A party contracting with a city is presumed to know whether the city is prohibited from making a contract. *Id.* at 153 (citing *Ligenza*, 133 Ill. App. 3d at 290-91). Landreth had the opportunity to specifically negotiate the terms of the Agreement to provide that his payments would come from a TIF or special revenue fund. He did not. As such, Landreth's negotiations with Pike do not provide a basis to reform the Agreement.

¶ 40 Accordingly, we find Landreth failed to establish a genuine issue of material fact as to whether the result of the original contract proceedings would have been any different had MBOK argued that the Agreement did not violate section 8-1-7 of the Code or sought a reformation of the

Agreement. Consequently, the trial court did not err when it granted defendants' motion for summary judgment.

¶ 41    In closing, we note that during oral arguments, this court asked the parties to file supplemental briefs to address the issue of damages. This court requested supplemental briefs on whether defendants would be entitled to a set-off for the uncollected judgment Landreth obtained against his former attorney. Given that we affirm on the issue of proximate cause, it is not necessary to reach the issue of damages.

¶ 42                                III. CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 44    Affirmed.